COMMONWEALTH of Pennsylvania, DEPARTMENT OF GENERAL SERVICES, Pennsylvania Department of Transportation, Pennsylvania Public Utility Commission, Pennsylvania Emergency Management Agency, and Pennsylvania Department of State, Plaintiffs

v.

UNITED STATES MINERAL PRODUCTS COMPANY, Certainteed Corporation, Courtaulds Aerospace, Inc., Chemrex, Inc. Phillips Electronics North America Corporation, Advance Transformer Company, and Monsanto Company, Defendants

Commonwealth of Pennsylvania, Department of General Services and Department of Transportation, Plaintiffs

v.

United States Mineral Products Company, Defendant.

Commonwealth Court of Pennsylvania.

Argued June 11, 2007.

Decided July 3, 2007.

Tybe A. Brett, Pittsburgh and Kenneth B. McClain, Independence, MO, for plaintiffs.

Thomas M. Goutman, Philadelphia, for defendants.

BEFORE: SMITH–RIBNER, Judge, and SIMPSON, Judge, and McCLOSKEY, Senior Judge.

OPINION BY Judge SIMPSON.

Was Monsanto Company's (Defendant) product, polychlorinated biphenyls (PCBs) defective, that is, unsafe for its intended use? After a five-week re-trial in this Court's original jurisdiction, a jury impaneled from Northampton County answered this interrogatory in the negative, thereby absolving Defendant from liability for alleged PCB contamination of the former Transportation and Safety Building (Building) in the Capitol Complex in Harrisburg, Pennsylvania.

Plaintiffs [1] filed the instant post-trial motions seeking judgment notwithstanding the verdict (JNOV) on the issue of product defect or, alternatively, a new trial, primarily alleging the jury's verdict is against the weight of the evidence. In addition, Plaintiffs contend the Court committed legal error in two evidentiary rulings and by limiting *voir dire*. As a final challenge, Plaintiffs allege juror misconduct and nondisclosure entitling them to a new trial. For the following reasons, we deny Plaintiffs' post-trial motions and enter judgment for Defendant.

## I. History

### A. Factual History

Defendant manufactured and sold PCBs [2] to other manufacturers for use in their products. When used as a plasticizer in other products, PCBs increased a product's durability, flexibility, and longevity.

In the late 1960s-early 1970s, the Commonwealth commissioned construction of the Building as part of the Capitol Complex. The Building was a twelve-story structure, with two separate heating, ventilation, and air-conditioning (HVAC) systems. The first HVAC system controlled air temperature on the basement and ground floors, and the second HVAC system controlled air temperature in the remainder of the Building.

During construction, various contractors used products containing PCBs. For our purposes, the relevant products included: adhesive tape used to seal duct board for the HVAC system; mastic between the floor tiles and concrete floors; gaskets on the perimeter of the HVAC system; and caulking between the pre-cast concrete exterior panels.

By 1994, Plaintiffs made plans to renovate the Building. Among the plans, Plaintiffs proposed removal of asbestos insulation to install a fire sprinkler system. In addition, Plaintiffs intended to replace or upgrade the Building's HVAC systems, electrical wiring, roof, exterior facade and elevators.

---

1. Plaintiffs include the Commonwealth Department of General Services (DGS), and former occupants of the Building, the Department of Transportation, the Public Utility Commission, the Pennsylvania Emergency Management Agency, and the Department of State.

2. PCBs are, in part, "any of several compounds that are produced by replacing hydrogen atom in biphenyl with chlorine, [having] various industrial applications...." Merriam–Webster's Collegiate Dictionary 900 (10th Ed.2001). The evidence here centered on two types of PCBs: Aroclor 1242 and Aroclor 1260/62. The statute known as the Toxic Substance Control Act of 1976 banned PCB manufacturing in the United States. *See* 15 U.S.C. § 2605(e)(3)(A)(i).

On June 16, 1994, a fire occurred on the Building's 6th floor. In the aftermath of the fire, PCBs were detected on surfaces and in the ambient air inside the Building. Ultimately, the Commonwealth imploded the Building in 1998 and replaced it with the Keystone Building.

## B. Procedural History

In 1990, Plaintiff DGS commenced an original jurisdiction action with this Court against U.S. Mineral Products for alleged asbestos contamination of the Building. After the 1994 fire, however, additional Plaintiffs filed a second action alleging negligence and strict liability against U.S. Mineral Products for damages allegedly caused by PCB contamination. Plaintiffs subsequently joined Defendant,[3] and we consolidated the two actions.

The cases eventually proceeded to a marathon trial before one of our distinguished senior judges. The jury was impaneled from Philadelphia County. At the trial's conclusion, the jury returned a Plaintiffs' verdict in the amount of $90 million. The Court subsequently reduced the award pursuant to a joint tortfeasor agreement, denied Defendant's post-trial motions, and molded the verdict to include delay damages. In total, the Court entered a $59,528,825 judgment against Defendant.

On Defendant's appeal, our Supreme Court reversed and remanded the matter for new trial. *See Pa. Dep't of Gen. Servs. v. U.S. Mineral Prods. Co.*, 587 Pa. 236, 898 A.2d 590 (2006)(*DGS I*). Although many issues were resolved, a critical part of the Supreme Court's extensive determination was that incineration of a product was not an intended use of the product. As a result of that distinction, Plaintiffs could recover from Defendant for damages relating to pre-existing contamination in the Building, but they could not recover from Defendant for damages or contamination arising from the 1994 fire. Accordingly, Plaintiffs were limited to seeking building remediation and relocation costs caused by alleged PCB contamination that existed before the fire.

## II. Present Proceedings

Prior to commencement of the second trial, the trial judge held a summary jury trial to assist the parties in assessing their positions and to negotiate settlement. In addition, the trial judge entertained extensive motions in limine. Of particular import here, the trial judge denied Plaintiffs' Motion to Exclude Evidence of Plaintiffs' Conduct. *See Pa. Dep't of Gen. Servs. v. U.S. Mineral Prods. Co.*, (Pa.Cmwlth. Nos. 284 M.D.1990 and 244 M.D.1996, filed October 26, 2006).

The second trial began on January 29, 2007. Numerous live witnesses testified, extensive prior testimony was read and voluminous documents were received.

After the close of evidence, the trial judge submitted three special interrogatories to the jury. As previously stated, the first interrogatory asked the jury to determine whether Defendant's product was defective, that is, unsafe for its intended use. The jury returned a verdict in Defendant's favor on this issue. Consequently, the jury never reached the last two interrogatories: whether Defendant's product caused Plaintiffs' alleged harm and, the amount of Plaintiffs' damages as a result of PCB contamination, if any.

---

**3.** Plaintiffs also joined as defendants Certainteed Corporation; Courtaulds Aerospace, Inc.; Chemrex, Inc.; Philips Electronics North America Corp.; and Advance Transformer Company. All other defendants were either granted summary relief, found not liable by a jury, or settled the claim. Therefore, the present proceedings involve only Defendant.

Plaintiffs timely filed post-trial motions, which are presently before the Court for disposition. First, Plaintiffs seek JNOV[4] or a new trial asserting the jury's verdict is against the weight of the evidence that PCBs are defective. Plaintiffs also seek JNOV or new trial on the grounds the court committed error by admitting evidence regarding the absence of sprinklers, and evidence of certain repair costs Plaintiffs did not seek to recover. Further, Plaintiffs allege inadequate and insufficient opportunity for *voir dire*. As a final assignment of error, Plaintiffs allege juror misconduct and nondisclosure during *voir dire*.

Preliminarily, we set forth the guiding principles when considering motions for JNOV and new trial. The criteria for granting these mutually exclusive types of post-trial relief are different. *Handfinger v. Phila. Gas Works*, 439 Pa. 130, 266 A.2d 769 (1970).

 Judgment notwithstanding the verdict may be entered on two bases: where the movant is entitled to judgment as a matter of law, and/or where the evidence is such that no two reasonable persons could disagree the verdict should have been rendered for the movant. *Moure v. Raeuchle*, 529 Pa. 394, 604 A.2d 1003 (1992); *Moody v. Phila. Housing Auth.*, 673 A.2d 14 (Pa.Cmwlth.1996). On the first basis, a court reviews the record and concludes that even with all factual inferences decided adverse to the movant, the law nonetheless requires a verdict in movant's favor. *Moure.* On the second basis, the court reviews the evidentiary record and concludes the evidence is such that a verdict for the movant is beyond peradventure. *Id.* Judgment notwithstanding the verdict should not be entered

where the evidence is conflicting on a material fact, and a reviewing court is required to consider the evidence, together with all reasonable inferences, in a light most favorable to the verdict winner. *Moody.*

 In order to obtain a new trial, however, the moving party must demonstrate in what way trial error caused an incorrect result. *Clack v. Commonwealth of Pa., Dep't of Transp.*, 710 A.2d 148 (Pa.Cmwlth.1998). Our analysis of whether Plaintiffs are entitled to a new trial follows a two step process. First, we must decide whether one or more mistakes occurred at trial. *Harman ex rel. Harman v. Borah*, 562 Pa. 455, 756 A.2d 1116 (2000). Second, if we conclude a mistake occurred, we must determine whether the mistake is a sufficient basis for granting a new trial. *Id.* The harmless error doctrine underlies every decision to grant or deny a new trial. *Id.* A new trial is not warranted merely because some irregularity occurred during the trial or another trial judge would have ruled differently; the moving party must demonstrate prejudice resulting from the mistake. *Id.* In addition, a new trial based on weight of the evidence issues will not be granted unless the verdict is so contrary to the evidence as to shock one's sense of justice. *Elliott v. Ionta*, 869 A.2d 502 (Pa.Super.2005). A mere conflict in testimony will not suffice as grounds for a new trial. *Id.* In ruling on a motion for new trial, the court must review all the evidence. *Abbott v. Onopiuk*, 437 Pa. 412, 263 A.2d 881 (1970).

### III. Post–Trial Motions

#### A. Weight of the Evidence

##### 1. JNOV

Plaintiffs' first claim entitlement to JNOV or new trial on the ground the

---

4. Plaintiffs seek JNOV in the nature of a directed verdict only on the issue of product

defect and request retrial on the issues of causation and damages. Pls.' Br. at 18.

verdict is against the weight of the evidence. Before we examine Plaintiffs' substantive arguments, however, we first address Defendant's argument Plaintiff failed to properly preserve a request for JNOV.

It is undisputed Plaintiffs did not move for a directed verdict at the close of Defendant's evidence. Notes of Testimony (N.T.) 1/28/07 at 3732–33. For this reason, Defendant asserts Plaintiffs waived the right to seek JNOV based on the sufficiency of the evidence. *Bennyhoff v. Pappert,* 790 A.2d 313 (Pa.Super.2001). *See Thomas Jefferson Univ. v. Wapner,* 903 A.2d 565, 570 (Pa.Super.2006) ("[c]ases indicate that in order to preserve the right to request a JNOV post-trial[,] a litigant must first request a binding charge to the jury or move for directed verdict at trial.") (citations omitted). *See also* Pa. R.C.P. No. 227.1.[5]

Plaintiffs respond a motion for directed verdict is not required because their challenge is limited to whether the jury's verdict is against the weight of the evidence. As a result, neither Rule 227.1 nor *Bennyhoff* mandate Plaintiffs seek a directed verdict as a condition precedent to post-trial relief. In their reply brief, Plaintiffs also rely on the Explanatory Comment to Pa. R.C.P. No. 226 (relating to points for charge and motion for directed verdict) for the proposition they were not required to move for directed verdict as a condition precedent to post-trial relief. The Explanatory Comment offers this guidance in pertinent part:

New subdivision (b) of Rule 226 provides a major change in practice. It eliminates the request for binding instructions and in its place provides for a motion for directed verdict. Unlike the point for binding instructions, the motion may be oral or written. Unlike its statutory predecessor, the rule contains no express requirement of the filing of a motion for directed verdict as a condition precedent for the filing of Motion for Post–Trial Relief.

 JNOV should be entered only in cases where a directed verdict would have been proper during the trial. *Scholastic Technical Serv. Employees, Pennsylvania State Univ., Local Union No. 8 v. Pennsylvania State Univ.,* 37 Pa.Cmwlth. 622, 391 A.2d 1097 (1978).

Under prior statutory authority, the submission of a written point for binding instructions was a mandatory prerequisite to the subsequent filing of a motion for JNOV. Pa. R.C.P. No. 226, Explanatory Comment–1983. The procedural rules covering post-trial practice were amended effective 1984. In relevant part, the amendments eliminated the practice of written points for binding instructions and allowed oral or written motions for directed verdict instead. *Id.* The amended rule relating to motions for directed verdicts

---

5. In relevant part, Pa. R.C.P. No. 227.1 provides (with emphasis added):
 (a) After trial and upon the written Motion for Post–Trial Relief filed by any party, the court may
 (1) order a new trial as to all or any of the issues; or
 (2) direct the entry of judgment in favor of any party . . .
 * * *
 (b) Except as otherwise provided by Pa. R.E. 103(a), *post-trial relief may not be granted unless the grounds therefor,*

 (1) *if then available, were raised* in pre-trial proceedings or *by motion, objection, point for charge, request for findings of fact or conclusions of law, offer of proof or other appropriate method at trial;* and
 (2) are specified in the motion. The motion shall state how the grounds were asserted in pre-trial proceedings or at trial. Grounds not specified are deemed waived unless leave is granted upon cause shown to specify additional grounds.

does not expressly condition a motion for post-trial relief on the filing of a motion for directed verdict. *Id.*

 Another rule controls here, however. Pa. R.C.P. No. 227.1(b)(1) specifically addresses post-trial motions. It provides that post-trial relief may not be granted unless the grounds were raised at trial by some appropriate method, if available. Consistent with this directive, our Superior Court requires a motion for directed verdict during trial as a prerequisite to a post-trial motion for JNOV based on the state of the evidence. *Thomas Jefferson Univ.; Bennyhoff.* Because this approach has the salutary effect of submitting the issue to the trial judge for initial evaluation during trial, when the proofs are still fresh, and is consistent with past practice and with the current rule governing post-trial practice, we agree with this approach and adopt it.

As a result, we conclude Plaintiffs failed to preserve a request for a JNOV because they did not ask the trial judge to consider a directed verdict on the first special interrogatory. We therefore limit our review to determining whether the jury's verdict is against the weight of the evidence so as to entitle Plaintiffs to a third trial.

### 2. New Trial

 A product will be deemed defective only if it "left the supplier's control lacking any element necessary to make it safe for its intended use or possessing any feature that renders it unsafe for the intended use." *Azzarello v. Black Bros. Co., Inc.,* 480 Pa. 547, 559, 391 A.2d 1020, 1027 (1978).

#### a. Plaintiffs' Contentions

As initial support, and without citation, Plaintiffs claim:

[i]n [*DGS I*], the [Supreme Court] accepted that the PCB containing products

in the ... Building should be deemed defective if they contaminated the building when used as intended, but remanded for a new trial to give the jury the opportunity to determine whether the contamination, or some part of it, was spread by the fire, and therefore not recoverable.

Pls.' Br. At 15. Defendant disputes Plaintiffs' apparent interpretation of *DGS I* that PCBs are *per se* defective. Def.'s Br. at 10.

We reject Plaintiffs' assertion. We surmise Plaintiffs' claim originates from the following discussion in *DGS I,* where the Supreme Court disposed of Defendant's allegation Plaintiffs failed to establish PCBs are unreasonably dangerous:

[C]onsidering the extensive evidence concerning the properties of PCBs, including their susceptibility to dispersal and tendency to accumulate in humans subject to multiple exposures, as well as the expert evidence regarding their adverse human health effects (the admission of which is not challenged in this appeal) and the decision of Congress to ban the general manufacture and distribution of PCBs and taking into account [Defendant's] assertion of its products' "miracle"—like utility, *we hold that the trial court did not err in submitting the product-defect claim to the jury.*

*DGS I,* 587 Pa. at 262, 898 A.2d at 606 (emphasis added; citations omitted). Clearly, this language does not suggest PCBs are defective as a matter of law or that no two reasonable persons could disagree as to defect. Rather, we read the Supreme Court's holding to indicate merely that Plaintiffs' evidence was sufficient to require submission of product defect to the jury. Because we conclude that our Supreme Court has not decided this issue

already, we proceed with an evaluation of the evidence presented during re-trial.

■ In our following analysis of the evidence, we are mindful the evidence must be viewed in a light most favorable to Defendant as verdict winner. *Bey v. Sacks,* 789 A.2d 232 (Pa.Super.2001). Moreover, credibility determinations are within the sole province of the jury. *Yacoub v. Lehigh Valley Med. Assocs., P.C.,* 805 A.2d 579 (Pa.Super.2002). Accordingly, a jury may believe all, part or none of the evidence presented. *Martin v. Evans,* 551 Pa. 496, 711 A.2d 458 (1998).

■ Plaintiffs' argument rests on what they describe as undisputed evidence that PCBs, when used as intended, contaminated the Building and can cause ill-health effects. In presenting their argument, Plaintiffs first identify Defendant as the sole manufacturer of PCBs in the United States (N.T. 2/2/07 at 789; 2/7/07 at 1078; 2/21/07 at 2683) and, the entity most "probably responsible for the U.S. contamination." N.T. 2/8/07 at 1406.[6]

Plaintiffs further identify evidence they believe undisputedly establishes PCBs, when used as intended, cause contamination. N.T. 2/1/07 at 550–53, 570, 578, 588–90; 2/12/07 at 1569, 1586, 1643–44, 1647, 1653, 1660; 2/6/07 at 946–47, 999–1006; 2/8/07 at 1404–06; 2/13/07 at 1825, 1850–52, 1879–89, 1892–94; 2/16/07 at 2304, 2306; 2/21/07 at 2696, 2708.

Finally, Plaintiffs examine the evidence which they believe proves PCBs cause ill-health effects. More specifically, PCBs are carcinogenic, and cause liver damage, immune system damage and neurological effects on developing children. N.T. 2/2/07 at 795–96, 799–803; 2/7/07 at 1095–96. Additional testimony demonstrated PCBs cause cancer in the liver, prostate, gall bladder and brain. N.T. 2/6/07 at 881; 2/7/07 at 1095. Plaintiffs further remind the Court that Defendant did not challenge their evidence of PCBs' ill-health effects and, at times, admitted accumulated exposure to PCBs may be harmful. N.T. 2/6/07 at 967–71, 974, 977, 980–81, 984, 986–87, 992–94.

### b. Contrary Evidence—Admissions and Actions

Notwithstanding the above, there is contrary evidence from which the jury could infer PCBs are not unsafe for their intended use. First, Defendant proved Plaintiffs made representations contrary to their position at trial. In particular, Plaintiffs represented to their employees and the general public the Building was safe for human occupation after the fire. More specifically, Plaintiffs issued a July 21, 1994, press release in which they proclaimed:

> After a clean bill of health by environmental consultants, the [Building] was ready to be reoccupied ... *without any adverse health impacts* on employees or the general public.
>
> "We are pleased that the results of the air quality tests show that the building is 'clean,' and we will be ready to resume customer service at the ground-floor level of the building at noon Friday," said Transportation Secretary Howard Yerusalim....
>
> More than 1,800 state employees were told not to report for Thursday's work schedule at the ... Building while an accelerated testing schedule was performed by environmental consultants for the Department of General Services.
>
> The testing and laboratory analysis were triggered by the *discovery of traces of "PCBs"* in enclosed areas above

---

**6.** Of note, defense witness John Woodyard testified Defendant was the principle manufacturer of PCBs but did not release all PCBs in the environment. N.T. 2/21/07 at 2683.

the ceilings of the 12–story building, which was damaged by fire on June 16.

PBCs (or polychlorinated biphenyls) are chemical compounds that were used mainly in the manufacture of electrical components. *At high levels of concentration,* PCBs are a known carcinogen.

*But the air quality testing results established that the PCB traces were well within the acceptable health standards* established by the American Conference of Governmental Industrial Hygienists.

"The results of the air quality testing conducted on all the floors have come back two-thousand times better than the acceptable level," Michael J. Daley, representing the Department of General Services, said. "According to the independent consultants, levels this low are difficult to detect."

\* \* \*

"The experts have clearly established that the trace of this chemical compound are well contained, are not in areas of public use, and *pose no health risk to the public or to our employees,*" said Yerusalim.

The laboratory results confirmed the early assessment of officials from the Department of Environmental Resources, who advised that it appeared unlikely that the PCB traces found had infiltrated into any areas of the building open for public use.

Def.'s Ex. DM 3178 (emphasis added). The press release is one of many statements by Plaintiffs the Building was safe for human occupancy. *See also* Def.'s Exs. DM 640 (August 1, 1994), DM 873 (November 1, 1994), DM 2897 (February 6, 1995), DM 658 (March 31, 1995) and DM 647 (May 23, 1995) (employee newsletters indicating employees would not be tested for PCB exposure; PCBs did not contaminate either surfaces or air in occupied areas;

PCBs levels were not expected to fluctuate; no expectation of accumulation in the body or long-term health effects on employees or visitors; PCB levels were below EPA guidelines; and exposure in the Building was not different from other environmental exposure); DM 592 (September 21, 1994 Harrisburg Patriot News article indicating occupied floors "continued to come up clean"); DM 668 (March 8, 1995 memo to employees indicating Building deemed environmentally safe); DM 688 (June 8, 1995 meeting of Board of Commissioners of the Public Grounds and Buildings indicating Building was safe); DM 660 (June 15, 1995 Core Relocation Team Meeting Minutes indicating over 20,-000 tests show Building was safe to occupy).

In conjunction with Plaintiffs' documented position PCBs levels in the Building post-fire were not a threat to the Building's occupants or the public, Defendant presented the testimony of Dr. James Logue, former Director of the Division of Environmental Health and Assessment for the Pennsylvania Department of Health (DOH) (Defendant's DOH expert). He testified that DOH physicians characterized the levels of PCBs in the Building as negligible and did not expect any accumulations in the body or any long-term health effects on either employees or visitors. N.T. 2/28/07 at 3601. He further opined everyone is exposed to PCBs through the environment, and exposure at the Building was not different from that found in the general environment. *Id.* at 3602.

### c. Contrary Evidence—Lack of Injury Claims

Further, Defendant proved the lack of personal injury claims arising from the alleged contamination. Defendant's counsel read the prior testimony of a former DGS secretary, who responded as follows

when asked whether anyone ever claimed a chemical exposure injury as a result of working in the Building:

I had no knowledge of anybody yet coming forward in terms of injury due to contamination to the [B]uilding.

N.T. 3/1/07 at 3977.

### d. Closing Argument

Emphasizing Plaintiffs' public position the Building was safe for human occupation post-fire, Defendant's counsel stated in his closing argument:

How do we know that PCB levels in the ... Building were safe, even after the fire?

\* \* \*

The Department of Health said it was safe. DGS said it was safe. [The Department of Transportation] said it was safe. [Plaintiffs' environmental cleaning expert] said it was safe. The union health consultant, remember you saw that document? The union was giving the data to the health consultant, and he said it's safe, it complied with EPA safe levels.

\* \* \*

Don't you think if there [were] high PCB levels in that [B]uilding for 30 years, which is [Plaintiffs'] theory, ... and they test these people most exposed, most potentially exposed, and they have normal PCB levels, what does that tell you about [Plaintiffs'] theory? It tells you, no, no, it can't be, no injury claims if PCBs are as bad as [Plaintiffs' counsel] wants you to believe.

N.T. at 3/1/07 at 3952–53. Also in his closing argument, Defendant's counsel again stressed the lack of personal injury claims during the Building's 30 year life span and 10 years of litigation. *Id.* at 3977.

The jury was free to accept Defense counsel's arguments, because they were supported by the evidence and all inferences favorable to Defendant. The jury could accept Plaintiffs' repeated representations that the Building was safe for human occupation. The jury could also give great weight to evidence that Plaintiffs continued to conduct business in the Building for nearly two years after the discovery of PCBs, with the approval of another state agency, the Pennsylvania DOH. Because Plaintiffs publicly represented the Building was safe for occupancy, because Plaintiffs conducted business in the Building for a significant period of time despite knowledge of the presence of PCBs, and because no injury claims yet occurred as a result of PCB contamination, the jury could conclude Defendant's product did not render the Building unsafe. Concomittantly, the jury could determine the product did not possess any feature that rendered it unsafe for its intended use. *Azzarello.*

Plaintiffs assert their admissions by word and deed relate only to the causation issue and not to the product defect issue. We disagree for two reasons. First, it was the duty of the fact-finder to sort through all the information and use it to resolve the complex questions submitted by the parties. Thus, the jury could assign any reasonable significance to the evidence, and it is not appropriate for this Court to invade the jury's function in this regard. Second, the legal definition of defect expressly includes the concept of safety. Therefore, admissions which relate to safety of the Building fall within the scope of evidence relevant to product defect.

### e. Technical and Expert Evidence

In addition, there was expansive technical and expert evidence regarding the levels of PCBs found in the Building, both

pre-and post-fire. The parties hotly contested what level of PBC removal rendered the Building safe. They presented the jury with two choices. Plaintiffs advocated a recommended clean-up level of 1 microgram per meter cubed, as set by the National Institute of Occupational Safety and Health (NIOSH). N.T. 1/30/07 at 54, 80; 1/31/07 at 281–83, 415, 434; 2/1/07 at 604, 689; 2/2/07 at 744, 807, 810, 885, 1038; 2/7/07 at 1105; 2/8/07 at 1490–91; 2/12/07 at 1557; 2/13/07 at 1797, 1802; 2/15/07 at 1961–62.

In contrast, Defendant argued the Building required cleaning to the Environmental Protection Agency (EPA) standard of 10 micrograms per meter cubed. N.T. 1/31/07 at 409, 416; 2/1/07 at 683–84, 689, 693; 2/7/07 at 1131–1132, 1134; 2/8/07 at 1285–86, 1298; 2/15/07 at 2072; 2/20/07 at 2446; 2/21/07 at 2570–73, 2579 2612, 2638, 2717, 2728, 2731.

Testimony established NIOSH made non-binding recommendations to Plaintiffs that appropriate PCB remediation required cleaning to the level of 1 microgram per cubic meter. Contrarily, Defendant established the less stringent EPA standard required Plaintiffs to remediate the PCB levels to 10 micrograms per cubic meter. Under either the NIOSH recommendation or EPA standard, the jury could reasonably infer some exposure to PCBs does not adversely affect human health. *Moure; Moody.*

Further, the technical evidence demonstrated the PCB levels in the Building were below the EPA standard *prior* to the 1994 fire. First, the evidence established PCBs are "ubiquitous ... [and] have been around in very low concentrations and [are found] in ... older building[s]...." N.T. 2/2/07 at 735. *See also* N.T. at 2/6/07 at 865; 2/7/07 at 1103–04; 3/12/07 at 1553–1557, 1673; 2/13/07 at 1740; 2/21/07 at 2594–96, 2648–49. Second, PCBs are con-

sidered one of the most stable and least volatile chemicals because they evaporate slowly and remain in place. N.T. 2/1/07 at 654, 658, 661; 2/6/07 at 958, 964; 2/12/07 at 1697–1700, 1713, 1717; 2/13/07 at 1767; 2/21/07 at 2597–98, 2607, 2618–19, 2678, 2680.

Additionally, Defense expert witness John Woodyard (Defendant's PCB expert), offered the following regarding background levels of PCBs:

> [I]n the interests of identifying what background levels might exist around Harrisburg, [Plaintiffs'] contractor went out to two other buildings within the vicinity of the ... Building, the Milton Hershey School, and the South Office building [renamed the Irvis Office Building], which is in the Capitol Complex, I understand. And they collected similar fireproofing samples in a situation where there was no fire. So that basically clean fireproofing samples, similar to the pre-fire samples from ... Building. And what you see here from their results is that the Milton Hershey School fireproofing contained 4.5 parts [per] million PCB, and the South Office Building contains 7 parts per million PCB. Again, without a fire. So this represents what you would expect to find in background samples in Harrisburg.

N.T. 2/21/07 at 2594–95. Defendant's PCB expert's testimony is depicted in Defendant's Exhibits DM 3156 and DM 3157A, which compare the Building's pre-and post-fire PCB levels (in asbestos) with levels in the Milton Hershey School and in the Capitol's South Office Building. The Exhibits demonstrate that prior to the 1994 fire, PCB levels in the Building were lower than the levels detected in both the Milton Hershey School and the South Office Building. *See also* Def.'s Ex. DM 279; Pls.' Ex. 1068.

Similarly, Defendant's PCB expert compiled Exhibit DM 3283, demonstrating PCB sample results from pre-fire asbestos from the Building. Disputing Plaintiffs' evidence, Defendant's PCB expert testified that tests on the pre-fire asbestos indicated the PCB levels on all floors, except two, were lower than the EPA standard. N.T. 2/21/07 at 2591–92; Def.'s Ex. DM 3283.[7]

As previously stated, under either NIOSH recommendations or EPA standards and environmental backgrounds levels higher than the Building pre-fire, the jury could reasonably infer some exposure does not adversely affect human health. Indeed, the evidence suggested only long term exposure to PCBs at concentrated or accumulated levels may potentially prove harmful to human health. The evidence here also established the PCBs levels in the Building pre-fire were lower than EPA approved levels and levels found in existing buildings. Such evidence supports a finding Defendant's product was not unsafe for its intended use. *Azzarello.*

In sum, Defendant's technical and expert evidence proved: a) Plaintiffs advised employees and the public the EPA standard was the correct measure of allowable PCB exposure; b) even long-term exposure levels below this standard were not harmful to human health; c) PCBs levels in the Building before and after the 1994 fire were below EPA allowable measures; and, d) the Building was safe for human occupation. Viewed in a light most favorable to the verdict winner, Defendant, these circumstances support the jury's verdict. Accordingly, we conclude the evidence was such that reasonable persons could disagree as to product defect, and a new trial is not warranted on this issue.

## B. Evidentiary Rulings

In their next challenge, Plaintiffs claim error in two evidentiary rulings: the trial judge erred in permitting Defendant to introduce evidence the Building lacked a sprinkler system and other safety features, and evidence regarding repair costs Plaintiffs did not seek to recover. In a pre-trial motion in limine, Plaintiffs sought to exclude evidence the Commonwealth failed to install a sprinkler system because it would impermissibly inject negligence concepts in a strict liability action. At trial, Plaintiffs objected to Defendant's introduction of testimony regarding the repair costs which they did not seek to recover, namely emergency response to the June 1994 fire, replacement costs for the roof and windows, electrical and mechanical upgrades, telephone and data communication upgrades, fire safety features, and other costs to

7. In addition, the parties presented significant evidence regarding "wipe samples" taken after the fire and during the cleaning process showing the presence of PCBs in the Building. As explained below, this evidence was most relevant to the causation issue, which was not reached by the jury. It is unclear to what extent this post-fire evidence is probative on Plaintiffs' product defect issue.

The parties contested the method by which PCBs dispersed throughout the Building. Plaintiffs maintained the PCBs dispersed during construction of the Building and throughout its life span by "off-gassing." Defendant argued the 1994 fire caused the PCBs to release and spread. Because the jury did not reach the issue of whether Defendant's product caused Plaintiffs' alleged harm, we cannot speculate as to which argument the jury would deem credible. To the degree the wipe samples are relevant, the results support Defendant's position that Plaintiffs represented to their employees and the public the Building was safe for human occupancy after the fire. N.T. 2/7/07 at 1264; Pls.' Exs. PEN 521A, PEN 696, PEN 714, PEN 733, PEN 768, PEN 885, PEN 997, PEN 1002, PEN 1019, PEN 1060, PEN 1064, PEN 1098. PEN 1322; Def.'s Exs. DM 260, DM 266, DM 267, DM 268, DM 269, DM 270, DM 272, DM 300, DM 650, DM 2748.

necessary to bring the Building into compliance with the Harrisburg building code.

"The admission or exclusion of evidence is within the sound discretion of the trial court ... [and][t]o constitute reversible error, an evidentiary ruling must not only be erroneous, but also harmful or prejudicial to the complaining party." *McManamon v. Washko*, 906 A.2d 1259, 1268–69 (Pa.Super.2006), *appeal denied*, 591 Pa. 736, 921 A.2d 497 (2007) (citations omitted).

 We reject Plaintiffs' plea for a new trial based on erroneous evidentiary rulings for two reasons. First and foremost, the evidentiary rulings of which Plaintiffs complain bear no relevance to the only issue reached by the jury; whether Defendant's product was defective. Thus, any alleged error in the evidentiary ruling would be harmless. *Cf. Alberts v. Ford Motor Co.*, 292 F.2d 494 (3d Cir.1961) (where jury found automobile was fit for intended use, trial court did not err in failing to charge jury with respect to express warranty).

 Second, although evidence of negligence has no place in strict liability actions, *see Kimco Development Corp. v. Michael D's Carpet Outlets*, 536 Pa. 1, 637 A.2d 603 (1993), evidence which is inadmissible for one purpose may be admissible for another. *Spino v. John S. Tilley Ladder Co.*, 548 Pa. 286, 696 A.2d 1169 (1997). A plaintiff in a strict liability action must show the product was defective, and the defect was the proximate cause of his injury. *Madonna v. Harley Davidson, Inc.*, 708 A.2d 507 (Pa.Super.1998). Consequently, "[i]nquiry into the plaintiff's use of the product may be relevant as it relates to causation." *Id.* at 508.

Here, the contested evidence was relevant to rebut Plaintiffs' damage claims. The trial judge permitted Defendant to introduce evidence demonstrating the lack of a sprinkler system and other safety features to show the condition of the Building prior to the 1994 fire and detection of PCBs. *Pa. Dep't of Gen. Servs. v. U.S. Mineral Prods. Co.*, (Pa.Cmwlth. Nos. 284 M.D.1990 and 244 M.D.1996, filed October 26, 2006); N.T. 2/9/07 at 1509; 2/15/07 at 1992; 2/16/07 at 2228, 2236–37, 2283; 2/23/07 at 3135–39, 3142, 3150–51, 3155, 3162, 3168, 3176–77, 3181, 3186; Def.'s Exs. DM 3163, DM 3193, DM 3201. This evidence tends to deflate the Building's pre-fire market value, and it was necessary to refute Plaintiffs' claims the Building was a "showcase." N.T. at 1/30/07 at 8.

Plaintiffs nevertheless argue Defendant improperly used the evidence by suggesting to the jury Plaintiffs' negligence caused the fire. As support, Plaintiffs rely on *Nigra v. Walsh*, 797 A.2d 353 (Pa.Super.2002). There, plaintiff commenced a personal injury action for back injuries sustained in an automobile accident. During cross-examination at trial, defendant posed questions phrased in such a way as to suggest plaintiff received Social Security benefits. A jury returned a defense verdict.

On review, the Superior Court rejected defendant's assertion that questions regarding Social Security were asked solely to establish inconsistencies between statements made on plaintiff's Social Security application and his position at trial. The Court noted defendant's questions did not always focus on the alleged inconsistencies. Accordingly, the Court concluded the real reason defendant inquired of Social Security was to inform the jury plaintiff received those benefits, a violation of the collateral source rule. Concluding it was impossible to determine what influence the information had on the jury's deliberations, the Superior Court granted a new trial.

*Nigra* is not persuasive. We thoroughly examined Defendant's use of the evidence throughout the trial, including closing argument, and find it respected the use for which the evidence was offered. Moreover, we fail to see how introduction of the Building's lack of safety features could affect the jury's decision that Defendant's product was not safe for its intended use. Plaintiffs' argument that the jury may have found Defendant's product not defective based on evidence the Building lacked certain safety features is pure speculation, which, if accepted, necessitates the conclusion the jury disregarded the trial judge's limiting instructions. We presume, however, the jury followed the instructions. *Mt. Olivet Tabernacle Church v. Edwin L. Wiegand Div.*, 781 A.2d 1263 (Pa.Super.2001), *aff'd*, 571 Pa. 60, 811 A.2d 565 (2002). Where there is no evidence to support such an argument, a new trial is not warranted.[8]

## C. Inadequate Opportunity for Oral Examination on *Voir Dire* and Insufficient *Voir Dire*

During the summary jury trial on remand, the parties utilized a written questionnaire to assist in *voir dire*. It became obvious, however, that reproducing and collating copies of a four-page questionnaire completed by a large number of venirepersons was time-consuming and inefficient. Thus, the trial judge reduced the questionnaire to one page after allowing the parties an opportunity to examine and comment upon it. Neither party objected to the new form prior to the commencement of *voir dire*. N.T. 1/29/07 at 90, 99, 100. The trial judge, foreseeing difficulty in selecting a jury due to the trial's expected six-week length, also requested juror availability for two consecutive days.

At commencement of the trial, the trial judge conducted preliminary *voir dire* to determine whether the venire would be sufficient in number to impanel a jury. The trial judge inquired whether there were any pre-paid vacations, medical procedures, or elder/child care issues with which service would interfere. Thereafter, the trial judge inquired whether the length of the trial would cause hardship for any prospective juror. The trial judge conducted individual *voir dire* of each responding venireperson regarding the nature of his or her hardship, during which counsel were present and invited to participate. At the conclusion of several hours of this preliminary *voir dire*, the Court excused a significant number of venirepersons. The remaining 69 venirepersons

**8.** Moreover, we find no merit in Plaintiffs' assertion the jury might have improperly considered Plaintiffs were responsible for the fire because the trial judge failed to repeat a limiting instruction when the jury requested additional instruction on product defect. N.T. 3/1/07 at 4039; 3/2/07, 4053. The trial judge provided the following limiting instruction on the issue of causation:

There has been mention of the absence of a sprinkler system at the time of the fire. *I allowed you to hear this evidence for limited purposes.* The installation of a sprinkler system was proposed before the discovery of PCBs. If you find that the costs were going to be incurred anyway, any pre-fire PCB contamination was not a factual cause

of those costs. Also, the absence of a sprinkler system may impact your determination on the value of the ... Building at the time of the fire, which I will discuss in more detail with the next question. *You may consider the evidence of the absence of a sprinkler system for these purposes only, and not for any other purposes.*

N.T. 3/1/07 at 4015–16 (emphasis added). First, repetition of that instruction would only serve to confuse the jury on the issue of product defect. Second, the judge provided the parties an opportunity to correct any errors or insufficiencies before the jury returned to deliberations. *Id.* at 4037; 3/2/07 at 4057. Neither party requested further clarification.

completed the juror questionnaire, which was then distributed to counsel for review.

Plaintiffs now complain the questionnaire failed to include pertinent questions required by Pa. R.C.P. No. 220.1 (relating to *voir dire*).[9] The trial judge, Plaintiffs assert, also truncated oral *voir dire* so as to complete it in one day where he previously indicated two days would be available if needed. These complaints have no merit.

■ The purpose of *voir dire* is to impanel a competent, fair, impartial and unprejudiced jury. *Williams v. Se. Pa. Transp. Auth.*, 741 A.2d 848 (Pa.Cmwlth. 1999). *Voir dire* is not intended to provide counsel with a better basis upon which to exercise peremptory challenges; rather, it contemplates the use of probing questions that uncover bias and facilitate the exercise of challenges for cause. *Commonwealth v. Smith*, 518 Pa. 15, 540 A.2d 246 (1988); *Commonwealth v. Sweeney*, 464 Pa. 425, 347 A.2d 286 (1975).

■ In addition, the scope of *voir dire* is within the sound discretion of the trial judge. *Id.* The decision of whether counsel may propose their own questions of potential jurors during *voir dire* is a matter left solely within the trial judge's discretion. *Salameh v. Spossey*, 731 A.2d 649 (Pa.Cmwlth.1999).

Plaintiffs maintain the trial judge's amended juror questionnaire, coupled with an abbreviated time for *voir dire*, provided an insufficient opportunity to inquire about other pertinent information, such as potential ties to lawyers who might have knowledge of the first trial, prior experience with asbestos, or other reasons a prospective juror might not be able to serve. As support, Plaintiffs refer to three venirepersons, and ultimately jury members, who expressed concerns regarding the trial's length. N.T. 1/29/07 at 26, 49, 63.[10]

■ The record belies Plaintiffs' allegation of insufficient opportunity for *voir dire*. Specifically, Plaintiffs inquired whether the panel members had any financial connection to the Commonwealth (*Id.* at 105); contact with the government generally (*Id.* at 109); information regarding

---

9. Pa. R.C.P. No. 220.1 provides *voir dire* shall be conducted to provide the following minimum information regarding prospective jurors and their households, where relevant: name; date and place of birth; residential neighborhood and zip code; marital status; nature and extent of education; number and ages of children; name, ages, and relationships of household members; occupation and employment history of prospective juror, spouse, children and household members; involvement as a party or witness in civil or criminal matters; relationship with law enforcement officers, lawyers, or other persons affiliated with the courts; relationship to the insurance industry, claims adjustor, investigator, agent or stockholder; motor vehicle operation and licensure; physical or mental condition affecting ability to serve; reasons why prospective juror believes he or she cannot or should not serve as juror; relationship with parties, attorney, or prospective witnesses of the particular case; and such other pertinent information as may be appropriate to achieve a competent, fair and impartial jury.

Use of a jury questionnaire is expressly permitted by the Rules of Civil Procedure. In particular, Rule 220.1(b) provides:
 The court may provide for voir dire to include the use of a written questionnaire. However, the use of a written questionnaire without opportunity for oral examination by the court or counsel is not a sufficient voir dire.
"A written questionnaire may be used to facilitate and expedite the voir dire examination by providing the trial judge and attorneys with basic background information about the jurors, thereby eliminating the need for many commonly asked questions." Pa. R.C.P. No. 220.1 Note. However, no form of questionnaire is mandated or suggested. *Id.*

10. The Court dismissed one of the three jurors after the first week of trial for cause. N.T. 2/2/07 at 826.

the Building (*Id.* at 114–15); negative impressions of lawsuits generally (*Id.* at 115); membership in organizations to reform the legal system (*Id.* at 117); involvement in any issues regarding chemicals (*Id.*); concerns regarding liability for products sold in the distant past (*Id.* at 142); and, experiences involving asbestos (*Id.* at 145). The Court neither restricted the questions posed nor interfered with Plaintiffs' thorough exploration of the venirepersons' responses. In addition, Plaintiffs inquired of each prospective juror responding to any question as to whether there were any reasons jury service could not be rendered fairly and impartially. *Id.* at *passim.*

Furthermore, the trial judge granted Plaintiffs additional time for *voir dire* at their request. After several hours of preliminary questions relating to the length of trial, Plaintiffs' counsel reviewed the jury questionnaires and embarked on general oral *voir dire.* After approximately 50 minutes of questioning by Plaintiffs' counsel, the trial judge inquired how much longer he intended to continue. At sidebar, the following colloquy occurred:

> [Plaintiffs' counsel:] I don't know how [Defendant's counsel] feels, but a bunch of these questionnaires have people that said they can't be fair about—maybe 10 of them, . . . .

> THE COURT: There are two people that said they can't be fair. I don't know how much time that's going to take. Look, tell me what you need. This is an important part of the trial, I understand that. But I'd like to get this done if we can. And you were certainly schmoozing and spending your time freely for a while. . . .

> * * *

> THE COURT: So this is my opportunity to focus you. How much time do you need?

> [Plaintiffs' counsel]: 30 minutes.

> THE COURT: [Defendant's counsel] gets the same amount of time. Okay.

N.T. 1/29/07 at 159.

With the additional 30 minutes permitted by the trial judge, Plaintiffs enjoyed over 80 minutes of general oral *voir dire,* in addition to the preliminary questioning and the written *voir dire.* Moreover, Plaintiffs' counsel was given all the time he requested, and he did not make further requests.[11] Under these circumstances, no basis for a new trial is evident.[12]

## D. Juror Misconduct and Non-disclosure

In their final claim, Plaintiffs assert juror misconduct and nondisclosure during

---

**11.** Contrary to Plaintiffs' assertions, the trial judge's willingness to undertake two days of *voir dire* resulted solely from concerns the trial's expected length would disqualify a large number of venirepersons. That concern was laid to rest when, after preliminary *voir dire* and challenges for cause, sufficient venirepersons remained to impanel a jury of 18 (including six alternates).

Moreover, Plaintiffs failed to object to the *voir dire* proceedings at any time. *See* N.T. 1/29/07. Accordingly, the *voir dire* proceedings may not constitute grounds for post-trial relief. Pa. R.C.P. No. 227.1(b)(1); *McManamon* (one must object to errors, improprieties

or irregularities at the earliest possible stage of the adjudicatory process to afford the jurist hearing the case the first occasion to remedy the wrong and possibly avoid an unnecessary appeal).

**12.** The Superior Court's decision in *Capoferri v. Children's Hospital of Philadelphia,* 893 A.2d 133 (Pa.Super.2006), upon which Plaintiffs heavily rely, does not command a different result. In that case, the trial court refused to allow the parties to ask prospective jurors regarding any pre-trial publicity regarding the "medical malpractice crisis." Here, the trial judge did not restrict the parties' *voir dire* examination.

*voir dire.* More specifically, Plaintiffs maintain Juror Sandra Wigder (Juror) failed to disclosure pre-trial experience with asbestos. As a result, Plaintiffs were precluded from conducting effective *voir dire* and deprived of the opportunity to ascertain whether Juror's prior asbestos experience would have affected the jury's impartiality.

In response to this allegation, the trial judge held a post-trial evidentiary hearing at which Plaintiffs examined Juror regarding her prior asbestos experience and conduct on *voir dire.* On April 18, 2007, the trial judge entered findings of fact based on Juror's testimony, which we append to this opinion and incorporate by reference. *See Pa. Dep't of Gen. Servs. v. U.S Mineral Prods. Co.,* (Pa.Cmwlth. Nos. 284 M.D. 1990; 244 M.D.1996, filed April 18, 2007).[13]

To summarize, Plaintiffs hired an out-of-state jury consultant to conduct unauthorized, *ex parte* post-verdict juror interviews. Juror assented to an interview, the true purpose of which was not disclosed to her. At the evidentiary hearing, Juror acknowledged she failed to affirmatively respond to Plaintiffs' oral *voir dire* regarding possible pre-trial asbestos exposure because she did not think her prior experiences involved asbestos. N.T. 4/16/07 at 12–13. Rather, Juror stated the trial evidence made her question her prior experiences. *Id.* at 15–18, 21, 25. Indeed, Juror never testified any pre-trial exposure to asbestos-containing products resulted in illness, injury or other harm. *Id.* at 13–17.

In addition, Juror admitted she affirmatively responded to question six on the juror questionnaire, which asked whether the prospective juror believes it is danger-ous if a person works with or is exposed to products containing asbestos. *Id.* at 19–20. Neither party individually questioned Juror based on her response to the question. *Id.* at 20. Importantly, Juror certified on the questionnaire she could be a fair and impartial juror. *Id.* at Def.'s Ex. 1.

■■■■ Initially, we are compelled to repeat our Supreme Court's severe admonition regarding the practice of interviewing jurors after a verdict without authorization from the trial judge:

The practice of interviewing jurors after a verdict and obtaining from them *ex parte,* unsworn statements ... is highly unethical and improper and was long ago condemned by this court in *Cluggage's Lessee v. Swan,* 1811, 4 Bin. 150, 158 reiterated and reaffirmed in *Friedman v. Ralph Bros., Inc.,* 314 Pa. 247, 249, 171 A. 900, 901, and again quoted from at length in *Redmond v. Pittsburgh Railways Co.,* 329 Pa. 302, 303–04, 198 A. 71, 72. It is forbidden by public policy: *Commonwealth v. Greevy,* 271 Pa. 95, 99, 114 A. 511, 512. Certainly, such post-trial statements by jurors are not to be given any weight on even an application for a new trial, much less a petition for a writ of *habeas corpus.*

*Commonwealth ex rel. Darcy v. Claudy,* 367 Pa. 130, 133–34, 79 A.2d 785, 786 (1951). *See also Oblon v. Ludlow–Fourth Corp.,* 406 Pa.Super. 591, 595 A.2d 62 (1991) (quoting *Claudy,* trial court not required to mold verdict based on affidavits of two jurors, obtained *ex parte* after jury discharged); 8 *Standard Pennsylvania Practice 2d,* § 48:51 (2007 ed.) (referencing *Claudy,* courts generally disapprove of

---

**13.** Plaintiffs also alleged juror Michael Gosling engaged in misconduct by failing to disclose prior asbestos experience on *voir dire.* The trial judge discharged Mr. Gosling for cause at the conclusion of the second week of trial. N.T. 2/9/07 at 1515–17. Plaintiffs, however, failed to introduce evidence of any acts or omissions by Mr. Gosling at the evidentiary hearing.

practice of interviewing jurors after verdict to obtain statements regarding what occurred in jury room).

Instead of the highly unethical, condemned and forbidden practice of *ex parte* post-verdict interviews, parties have a remedy that comports with due process: a hearing in open court, on the record, after notice to all parties. This remedy is specifically provided by the rules. Pa. R.C.P. No. 228 (testimony as to misconduct of a juror).

■ Turning to the hearing held here on allegations of juror misconduct, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions in reaching a decision upon the verdict or concerning the juror's mental processes in connection therewith, and a juror's affidavit or evidence of any statement by the juror about any of these subjects may not be received. Pa.R.E. 606(b); *see Carter v. United States Steel Corp.*, 529 Pa. 409, 604 A.2d 1010 (1992). However, a juror may testify concerning whether prejudicial facts not of record, and beyond common knowledge and experience, were improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror. *Id.*

■ Once the existence of a potentially prejudicial extraneous influence has been established by competent testimony, the trial judge must assess the prejudicial effect of such influence. *Carter; Pratt v. St. Christopher's Hosp.*, 824 A.2d 299 (Pa.Super.2003). In determining the reasonable likelihood of prejudice, the trial judge should consider: (1) whether the extraneous influence relates to a central issue in the case or merely involves a collateral issue; (2) whether the extraneous influence provided the jury with information they did not have before them at trial; and (3) whether the extraneous influence was emotional or inflammatory in nature. *Id.* Where the extraneous evidence is not new, but rather is evidence that was presented at trial, prejudice is not established. *Pratt.*

■ Based on Juror's testimony at the evidentiary hearing, the trial judge determined as follows:

Taking judicial notice of all the occurrences at the five-week trial, and following the prejudice analysis discussed in *Carter v. United States Steel Corp.*, 529 Pa. 409, 604 A.2d 1010 (1992) and *Pratt v. St. Christopher's Hospital*, 824 A.2d 299 (Pa.Super.2003), the Court makes the following findings: a) the only special interrogatory answered by the jury was whether Defendant Monsanto's product (polychlorinated bi-phenyls, or PCBs) was defective, and issues relating to a different product (asbestos) manufactured by a different party were collateral to the one answer given by the jury; b) given the extensive evidence during trial about asbestos, its uses, its properties, its health risks and the ways in which it may be remediated, the pre-trial experiences described by Juror which may have involved asbestos could not provide the jury with information it did not have before it at trial; and, c) the pre-trial experiences described by Juror which may have involved asbestos were not emotional or inflammatory in nature. Accordingly, the Court finds there is no reasonable likelihood of prejudice from Juror's non-disclosure of pre-trial experiences with asbestos.

*See Pa. Dep't of Gen. Servs. v. U.S. Mineral Prods. Co.*, (Pa.Cmwlth. Nos. 284 M.D.1990; 244 M.D.1996, filed April 18, 2007) at 5.

Because Plaintiffs failed to demonstrate a reasonable likelihood of prejudice from Juror's non-disclosure of possible pre-trial experiences with asbestos, a new trial is not warranted.

## IV. Summary

The jury's verdict is a culmination of their lengthy service, hard work, and dedication to the justice system. The Court thoroughly reviewed the evidence in this matter. With the evidence before us, we are confident the record supports the verdict and, therefore, deny Plaintiffs' post-trial motions in their entirety.

AND NOW, this 3rd day of July, 2007, upon consideration of Plaintiffs' Motion for Post–Trial Relief under Pa. R.C.P. 227.1 and Defendant's Response thereto, it is hereby ORDERED said Motion is **DE-NIED** and **DISMISSED**. The Chief Clerk is directed to enter judgment on behalf of Defendant Monsanto Company.