# Cox v. Philadelphia, Harrisburg & Pittsburg Railroad Company, Appellant.

*Railroads—Eminent domain—Measure of damages—Profits—Map—Evidence.*

The measure of damages for land taken or injured by a railroad company under the right of eminent domain is the difference in the market value of the tract as a whole before the taking and afterwards as affected by it. In adjusting this difference, the landowner is entitled to have the jury take into consideration the value of his property for any and every purpose or use to which it may be adapted, and to have the damages assessed upon a basis of the most valuable use to which the property may be adapted. On the other hand, the railroad company is entitled to any benefits or advantages which may accrue to the part of the tract of land, not taken or injured, by reason of the construction of the improvement.

No allowance of damages for an actual or supposed loss of business profits carried on upon the premises can be made.

A landowner is not limited to any one use for which his property may be available, but he is entitled to have its value considered for any and all purposes for which it can be used.  He may, therefore, show by any competent testimony, expert or otherwise, that it is specially valuable for a certain particular purpose, such for instance as the raising of ducks.  He will not, however, be permitted to show how many ducks he raised, or could raise in a year; nor will his witnesses be permitted to base the estimate of damages upon the profits which they thought the owner would derive from the duck-raising business.

In such a case the defendant railroad company cannot show that the use of the land as a duck farm would pollute the stream passing through it, and thereby prevent the use of the land for duck-raising purposes.  Such a question is a collateral issue relating to matters between the owner and the lower riparian owners, and the railroad company in condemnation proceedings is not in a position to raise it.

In railroad condemnation proceedings it is proper to reject a map which is shown to be an incorrect representation of the ground, and made by a party who had not the data from which he could make an accurate map.

Argued April 25, 1906.   Appeal, No. 100, Jan. T., 1906, by defendant, from judgment of C. P. Cumberland Co., Sept. T., 1905, No. 4, on verdict for plaintiff in case of R. G. Fox v. The Philadelphia, Harrisburg & Pittsburg Railroad Company. Before FELL, BROWN, MESTREZAT, POTTER and ELKIN, JJ. Reversed.

Appeal from award of jury of view.

Verdict and judgment for plaintiff for $5,000.   Defendant appealed.

*Errors assigned* were various rulings on evidence referred to in the opinion of the Supreme Court.

*John W. Wetzel,* of *Wetzel & Hambleton,* for appellant.— Profits cannot be considered as an element of damages : Penna. R. R. Co. v. Eby, 107 Pa. 166 ; P. & W. R. R. Co. v. Patterson, 107 Pa. 461; Hamilton v. R. R. Co., 190 Pa. 51.

*F. E. Beltzhoover,* with him *S. B. Sadler,* for appellee.—The offer as to the pollution of the stream was properly refused for the reason that it raised a collateral issue and was res inter alios: Coal Co. v. Sanderson, 113 Pa. 126 ; Hauck v. Pipe

Line Co., 153 Pa. 366; Hayes v. Waldron, 44 N. H. 580; Lockwood Co. v. Lawrence, 77 Me. 297; Baltimore v. Warren Mfg. Co., 59 Md. 96; Barnard v. Sherley, 135 Ind. 547 (34 N. E. Repr. 600); Roller Mills v. Wright, 30 Minn. 249 (15. N. W. Repr. 167); Hazeltine v. Case, 46 Wis. 391 (1 N. W. Repr. 66).

OPINION BY MR. JUSTICE MESTREZAT, May 24, 1906:

This was a proceeding in the court below to assess the damages sustained by the plaintiff by reason of the defendant company's appropriation of a strip of his land for widening its right of way. The viewers having reported in favor of the plaintiff, the defendant appealed to the common pleas, in, which an issue was framed and the case was tried before a jury, resulting in a verdict and judgment for the plaintiff. The defendant has appealed to this court.

It is well settled that the measure of damages for land taken or injured by a railroad company under the right of eminent domain is the difference in the market value of the tract as a whole before the taking and afterwards, as affected by it. In adjusting this difference, the landowner is entitled to have the jury take into consideration the value of his property for any and every purpose or use to which it may be adapted, and to have the damages assessed upon a basis of the most valuable use to which the property may be adapted. As said by the present Chief Justice in Harris v. Railroad Company, 141 Pa. 242: "In estimating the value of the lot before the taking, its possible and probable uses are important elements, and may be shown by the opinion of experts." On the other hand, the defendant company is entitled to any benefits or advantages which may accrue to the part of the tract of land, not taken or injured, by reason of the construction of the improvement. In ascertaining the damages, therefore, the jury must take into consideration the value of the land for the uses to which it has been or may be applied, and the special advantage the construction of the road may be to the residue of the tract through which it is constructed.

While these general principles, applicable to the assessment of damages in condemnation proceedings, are well settled, there is another rule which has been recognized and enforced for

more than three-quarters of a century in this state, which pro-
hibits the landowner from having the profits of his business
considered by the jury in determining the value of the property
which is affected or injured by the improvement. " We have
so often said," says Mr. Justice GREEN in Becker v. Philadel-
phia & Reading R. R. Co., 177 Pa. 252, " that the profits of
business could not be recovered in condemnation proceedings
that it seems like a waste of time to cite the decisions. As far
back as Thoburn's Case, 7 S. & R. 411, it was held that, in esti-
mating the damages done to the landowner, the jury are to
value the injury to the property at the time the injury was
suffered, without reference to the person of the owner or the
state of his business. The allowance of damages for an actual
or supposed loss of profits in a business carried on upon the
premises by reason of the taking, was most emphatically con-
demned in the opinion, and that decision has been followed by
this court from that day to this. . . . After stating the
injustice of allowing for the profits of business to be carried on,
the Chief Justice added (in Thoburn's Case), 'That would
make the defendant an insurer of ordinary profits in a new
state of the business, pushed to a morbid extent, and would put it
in the power of the plaintiff to increase the damages to any ex-
tent he might think proper. I mention this to show the danger
of taking into consideration circumstances posterior to the time
when the privilege is fully entered on, and its consequences to
the individual to be compensated are ascertained.' " Pittsburg
& Western Railroad Co. v. Patterson, 107 Pa. 461, originated
in a proceeding for the assessment of damages occasioned by
reason of the location of the defendant's road through the plain-
tiff's land. In delivering the opinion in that case, Mr. Justice
CLARK said (p. 464) : " The use to which the property has been
or may be applied is proper for the consideration of the jury,
in the estimate of its value, its adaptation for any particular
purpose may enchance its market value, but the court was cer-
tainly correct in saying that the jury could not take into con-
sideration any supposed loss to the plaintiff, of profits in his busi-
ness. Such an assessment would be purely speculative, and the
rule which justified it would lead to most ruinous results. If
the property, by reason of its location or otherwise is especially
adapted to any particular use to which it is applied, if it is

worth more for that particular use than for any other, its market value will be measured accordingly."

In the case at bar it was proper for the plaintiff to call witnesses to show the uses or purposes for which his land was specially adapted, including that of duck raising. The landowner, in condemnation proceedings, is not limited to any one use for which his property may be available, but he is entitled to have its value considered for any and all purposes for which it can be used. He may, therefore, show by any competent testimony, expert or otherwise, that it is specially valuable for a certain particular purpose and that purpose must enter into its value before the jury. So, here, it was proper for the plaintiff to show by competent expert testimony the value of his property for duck-breeding purposes, and the jury was required, in passing upon the case, to take into consideration its value for that purpose. But in every case of this character the parties to establish their contention are required to produce competent testimony, and the question of competency was one for the court to determine. The plaintiff called at least four witnesses as experts to show the value of his farm for duck-raising purposes. Conceding that they disclosed sufficient knowledge of the business to make them competent to testify as to the adaptability of the property for a duck farm, their testimony clearly showed that their valuation of the property for such purpose rested upon an erroneous basis, the profits which the plaintiff would realize out of the business conducted upon the land. Mr. Stouffer fixed the plaintiff's damages, by reason of the construction of the road through the premises, at $8,000. Of this sum he allowed $6,000 as the value of a pen on the premises destroyed by the defendant company. In testifying as to this item of depreciation, he said : " That will depreciate the capacity about 2,000 ducks a year—our books will show twenty per cent apiece profit on a duck; that will be $400 a year. I arrive at that conclusion in this way—that is not taken for one year—it is taken for all time. . . . If we were in business for twenty years—and there is no reason why we should not be— that would be $8,000 loss, without any interest." Mr. Cox, the plaintiff, fixed the damages at about $10,000. He said the land was worth $1,500 as land and that the encroachment of the railroad on the part of the land used as a

duck farm had reduced its capacity or output to the extent of
a capitalization of $8,000. He testified : " Q. How much of
the $8,000 do you estimate as loss to the farm as a duck farm?
A. It reduces their output to that extent.  Q. How much?  A.
About $500 or $600 a year—It reduced the breeding pens so
that the eggs laid and the ducks produced are less by at
least 2,000 per year—2,000 marketable ducks.  Q. And you
calculate so much profit on each duck?  A. Yes.  Q. What
profit do you count on that?  A. The duck people usually
get twenty cents per duck.  Q. Is that the way you estimate
the $8,000 by estimating the profits?  A. Yes." Mr. Morgan,
another witness, estimated the plaintiff's damages at from $8,000
to $10,000.  He thought the space cut off on the water front
would be sixty feet, and based his estimate of the damages on
that fact.  He testified : " Well that (sixty feet) will accommo-
date even breeding ducks, which would produce 6,000 ducks ;
I figure fifteen cents profit—that represents a loss of $900 a
year." George Woods, called by the plaintiff, fixed the damages
at $8,000.  His manner in arriving at this sum as damages is
stated in his testimony as follows : " You could handle about
200 breeders there, which would produce eggs enough from
which you could probably market 6,000 ducks, at, say, from
fifteen to twenty cents apiece profit—or it could be used as a
fattening pen for fattening ducks.  I think 2,000 can be handled
in that building in a season, in a year, and from those 2,000,
judging from the market profits, $400 should be derived."
William Nicholson, another witness, places the damages at from
$8,000 to $10,000.  His estimate was based upon the fact that
the defendant company destroyed the best duck pen on the
premises, in which 2,000 ducks could be raised for the mar-
ket in a season and that would decrease the capacity of the farm
to that extent.  His estimate was fixed by allowing twenty cents
profit on each duck raised.

At the close of the case, the defendant's counsel moved to
strike out that part of the testimony of the above witnesses re-
lating to the value placed by them on the injury done to the
plaintiff's property, but the motion was denied.  The testimony
discloses the fact that the witnesses arrived at their conclusion
as to the damages sustained by the plaintiff on an erroneous
basis.  Their estimates were made upon the profits which they

thought the plaintiff would derive from the duck-raising busi-
ness. Such basis was entirely too uncertain and speculative
to permit it to enter into any calculation or estimate of the
damages which the plaintiff sustained by reason of the construc-
tion of the defendant's road through his premises. In speaking
of the manner of estimating the value of land in eminent do-
main cases by considering the profits realized therefrom, Mr.
Justice WILLIAMS in Reading & Pottsville Railroad Co. v. Bal-
thaser, 126 Pa. 1, said (p. 10) : " We held (on a former appeal
of the same case) that such a method for fixing the value of
the land was speculative, and could not be applied to land
taken by virtue of the right of eminent domain. It involves
an uncertain estimate of the quantity and quality of the stone,
includes necessarily the use of labor and capital, requires skill
and intelligent supervision on the part of the operator, and vig-
ilence and success in the financial management. No human
mind can foresee the presence of these elements of business
success, or forecast the profit or loss of actual operations, if
the stone be removed at the ordinary rate of quarrying." We
are clearly of opinion that the defendant's motion should have
been allowed and that the estimates of the witnesses as to the
value of the plaintiff's land and the damages suffered by the
construction of the road through it should have been struck
from the record.

The court did not err in excluding the map offered in evi-
dence by the defendant company. It was not shown to be a
correct representation of the ground taken nor of the buildings
affected; on the other hand, it appeared by the testimony of the
party who made it that he did not have the data from which he
could make an accurate map. In the trial of cases of this char-
acter, there should be a map of the locus in quo, as it aids most
materially the court as well as the jury in the consideration of
the case. From the evidence before us, it is difficult to de-
termine the location of the spring or the buildings or the course
of the stream with reference to the strip of land condemned.

The offer by the defendant to show that the use of the plain-
tiff's land as a duck farm would pollute the stream passing
through it and thereby prevent the use of the land for that
purpose, was properly rejected as raising a collateral issue which
could not be determined in this case. Whether the lower

riparian owners would object to such use of the land was uncertain and purely speculative; and if they did, non constat that the objection could not, at small expense, be removed. At all events, the defendant company is not in a position to assert the rights of the lower riparian owners who alone have an action against the plaintiff here for any injury which they may sustain by an interference with the purity or flow of the stream.

The eighth assignment must be sustained notwithstanding the attempt to cure the error in the general charge. The plaintiff had the right, as we have held, to show that his farm was adapted to the use of and was valuable for duck raising, but he could not show the average number of ducks he raised on the farm each year. While in one sense such testimony would show the productive capacity of the farm per year, it would also afford the jury an opportunity to estimate the profits of the land. The plaintiff could show by competent testimony the acreage of his land and also its adaptability for the duck business by reason of its location, water, etc., which the jury was required to consider as an element of value; but when he was permitted to show that he produced from 45,000 to 50,000 ducks per year it furnished the jury the data from which it could and doubtless did ascertain the profits of the business which it used as a basis in determining the market value of the plaintiff's property. The number of ducks the plaintiff may produce on the land in the future depends upon so many contingencies that any estimate thereof would be purely speculative and should not go to the jury even as evidence of the productive capacity of the farm.

The assignments of error are sustained so far as the matters complained of therein are in conflict with the views above expressed and the judgment is reversed with a venire facias de novo.