956 A.2d 967

**COMMONWEALTH of Pennsylvania, DEPARTMENT OF GENERAL SERVICES, Pennsylvania Department of Transportation, Pennsylvania Public Utility Commission, Pennsylvania Emergency Management Agency, and Pennsylvania Department of State, Appellants**

**v.**

**UNITED STATES MINERAL PRODUCTS COMPANY, Certain-Teed Corporation, Courtaulds Aerospace, Inc., Chemrex, Inc., Phillips Electronics North America Corporation, Advance Transformer Company, and Monsanto Company, Appellees.**

Supreme Court of Pennsylvania.

Argued May 12, 2008.

Decided Sept. 26, 2008.

332

Maryanne Mueller Lewis, Esq., Kenneth B. McClain, Esq., Tybe Ann Brett, Esq., Thomas W. Henderson, Esq., PA Office of Attorney General, for COM of PA, DGS, DOT, PUC, PEMA and DOS.

Kim Kocher, Esq., Thomas Marsh Goutman, Esq., White and Williams, L.L.P., Philadelphia, for Monsanto Company.

BEFORE: CASTILLE, C.J., and SAYLOR, EAKIN, BAER, TODD and McCAFFERY, JJ.

## OPINION

Justice SAYLOR.

Our present review is of a retrial of a product liability action arising out of chemical contamination at the former Transportation and Safety Building in the Capitol Complex in Harrisburg.

The background is set forth at length in the Court's initial decision in *Pennsylvania Department of General Services. v. U.S. Mineral Products Corp.*, 587 Pa. 236, 898 A.2d 590 (2006) (*"DGS I "*). Briefly, DGS and other state agencies ("Appellants") sued Monsanto Corporation for chemical contamination in the Transportation and Safety Building (the "T & S Building") from the release of polychlorinated biphenyls ("PCBs") alleged to have been manufactured by Monsanto. Appellants

limited their liability theory to strict liability and initially secured a $90 million verdict at the conclusion of a lengthy jury trial in the Commonwealth Court. This Court reversed, however, holding that judgment notwithstanding the verdict should have been awarded on various claims, and a new trial was required as to others. *See id.* One of the grounds supporting the award of a new trial resulted from the conflict in the evidence concerning whether PCBs were distributed to surfaces throughout the T & S Building in the ordinary use of PCB-containing products, or whether the chemical was spread in smoke and soot during a severe fire occurring in June 1994, after which PCBs were first detected on the surfaces.[1] The trial court, however, had erroneously failed to issue instructions requested by Monsanto to distinguish between fire- and non-fire related contamination. *See DGS I,* 587 Pa. at 252–59, 898 A.2d at 600–04 (explaining that strict liability is available only for harm that occurs in connection with a product's intended use by an intended user, and that the incineration of building materials is not an intended use).

The Honorable Robert Simpson, Jr. presided over the retrial, in which an appropriate instruction was issued to the jurors. This trial culminated in a defense verdict, upon a jury finding that Monsanto's product was not defective. Appellants filed timely post-trial motions, which were denied by a three-judge panel of the Commonwealth Court. *See Department of General Services v. U.S. Mineral Products Corp.,* 927 A.2d 717 (Pa.Cmwlth.2007) (*"DGS II"*). This direct appeal ensued, in which Appellants challenge the verdict as against the weight of the evidence, contending that the evidence was undisputed that Monsanto's product was unsafe for its intended use, and therefore, defective; the trial court erred in admitting evidence regarding the absence of sprinklers and other fire-safety features, thus facilitating Monsanto's efforts to advance what was essentially an impermissible contributory negligence defense; the trial court erred in admitting evidence regarding costs to repair the T & S Building that Appellants

1. There was no dispute that PCB-containing building materials were consumed by fire during the event.

did not seek to recover, thereby inappropriately suggesting to the jurors that the claimed damages were caused by negligent maintenance as opposed to product defect; and the trial court inappropriately curtailed *voir dire*, depriving Appellants of a full and fair opportunity to explore disqualification matters. Appellants seek a new trial.

The governing review principles require the award of a new trial only where a trial court has committed an error of law or abuse of discretion which may have affected the verdict. *See Harman ex rel. Harman v. Borah*, 562 Pa. 455, 467, 756 A.2d 1116, 1122 (2000).

## I. The Against–The–Weight–Of–The–Evidence Claim

In addressing Appellants' claim that the jury finding of no defect was against the weight of the evidence, the Commonwealth Court initially summarized Appellants' evidence of product defect, including testimony that PCBs are harmful to human health and were unintentionally disbursed throughout the T & S Building through the ordinary course of the operation of the building's heating and ventilation system. *See DGS II*, 927 A.2d at 726. The Commonwealth Court, however, catalogued the following evidence that PCBs were safe when used as intended, including: Appellants' representations to employees and the public that the T & S Building was safe for human occupation after the fire, *see id.* at 726–27; testimony from a former division director for the Pennsylvania Department of Health that PCB levels in the building were negligible and that he did not expect any long-term health effects for employees or visitors, *see id.* at 727; the absence of personal injury claims arising from PCB contamination of the building, *see id.* at 727–28; and expansive technical and expert evidence regarding the levels of PCBs in the T & S Building, both pre- and post-fire, *see id.* at 728–30. The court observed that the evidence suggested that only long-term exposure to PCBs at concentrated or accumulated levels may potentially prove harmful to human health. *See id.* at 730. Further, the court highlighted that PCB levels in the T & S Building before the fire were lower than those approved by the Environmental

Protection Agency and found in other buildings. *See id.* Upon such review, the court concluded that the evidence was such that reasonable persons could disagree as to product defect, and therefore, a new trial was not warranted. *See id.*

Presently, Appellants contend that it was undisputed at trial that PCBs are susceptible to dispersal; tend to accumulate in humans subject to multiple exposures; are capable of causing human illness; and, indeed, represent the only substance ever to have been banned by Congress, *see* 15 U.S.C. § 2605(e). Appellants point to Monsanto's own documents characterizing PCBs as a "worldwide ecological problem" and indicating that "Monsanto is most probably responsible for the U.S. contamination." N.T., February 8, 2007, at 1405–1406. Appellants also reference testimony from Dr. James Melius, an epidemiologist, who indicated, *inter alia,* that PCBs are carcinogens and have other known adverse health effects, including liver damage, immune system damage, and neurological effects on developing children. *See* N.T., February 2, 2007, at 798–802. Further, Appellants rely on testimony from Dr. Richard Lemen, a former director of the National Institute for Occupational Safety and Health, discussing such health effects, *see* N.T., February 7, 2007, at 1095, and the agency's recommendation that PCB presence in buildings be limited to the lowest feasible limit (one microgram per one-hundred centimeters squared for surfaces), *see id.* at 1103–1105, as distinguished from a higher risk-based threshold generally maintained by the Environmental Protection Agency. Appellants stress that Monsanto offered no evidence to challenge the testimony of Drs. Melius or Lemon regarding the overall health effects related to PCB exposure; to the contrary, they assert that Monsanto made multiple admissions regarding the toxicity of the substance.

As to the spread of PCBs throughout the T & S Building, Appellants contend that at least a significant amount, if not all, occurred as a result of PCB-containing building materials used as intended. Appellants support this conclusion by reference to the testimony of industrial hygienists John Kominsky and William Ewing, who opined that PCBs used as a component of

glue in the building's ductwork were released as vapor into the air stream during the ordinary use of the heating and ventilation system. *See* N.T., February 1, 2007, at 598; N.T., February 12, 2007, at 1569, 1643–44. Mr. Kominsky also testified that PCBs were disbursed when the ductwork was fabricated through the process of sealing the assembled segments with a hot iron. *See id.* at 1647. Appellants observe that samples of building materials taken from the T & S Building prior to the fire were contaminated with the type of PCB used in the ductwork, which they contend negates Monsanto's theory that the migration occurred solely on account of the fire. Appellants also develop that there were PCBs in other building products, including PCB-containing caulking material which migrated to pre-cast concrete panels on the exterior of the building, *see* N.T., February 13, 2007, at 1825, 1850–52, and mastic used to attach floor tile, which they assert contaminated the concrete deck, *see id.* at 1893–1894.

With regard to the Commonwealth Court's reasoning supporting the denial of a new trial, Appellants argue that the court overemphasized the absence of immediate bodily injury in disregard of *DGS I*, which recognized the significance of an increased risk to human health in a property-damage case. *See DGS I*, 587 Pa. at 260, 898 A.2d at 605. Finally, Appellants contend that the refusal to grant post-trial relief on against-the-weight-of-the-evidence grounds may be explained by the trial judge's displeasure with Appellant's trial counsel for commissioning post-verdict interviews with jurors. *See* N.T., April 16, 2007, at 51–55.

For its part, Monsanto defends the Commonwealth Court's rationale, characterizing Appellants' evidence of harmfulness as abstract from any assessment of the nominal levels of PCBs found in the T & S Building resulting from ordinary use of PCBs in the building materials.[2] Monsanto highlights this Court's holding in *DGS I* that Appellants were required to

**2.** In this regard, Monsanto explains that the studies relied on by Appellants' experts were primarily high-dose animal studies and assessments of workers having substantial levels of occupational exposure. *See, e.g.,* N.T., February 6, 2007, at 857, 981–984.

establish that the presence of PCBs, unrelated to the fire, rendered the building unsafe. *See DGS I*, 587 Pa. at 260–62, 898 A.2d at 605–06. Further, it argues that the Commonwealth Court's conclusion that the mere presence of PCBs does not give rise to strict liability is consistent with *DGS I* and testimony of Appellants' representatives; representatives of the Department of Health; and Appellant's own litigation experts, who conceded that there are safe levels. Indeed, Monsanto emphasizes, as did the Commonwealth Court, that documents and testimony of officials from DGS, the Department of Health, and the Department of Transportation demonstrated that PCB levels found in the building, even after the fire, were "well within the acceptable health standards," "negligible," and "pose[d] no health risk." *DGS II*, 927 A.2d at 726–27 (citations omitted). Monsanto argues that the jury was free to credit Appellants' pre-litigation statements over the contradictory opinions offered by Appellants' litigation experts at trial.

Monsanto also points to substantial evidence to the effect that the PCBs found on surfaces within the T & S Building were not reposited during the intended use of the building materials, but were spread by smoke and soot during the fire. In this regard, it explains that tests commissioned by its expert on pre-fire building materials showed only nominal PCB bulk-sample levels (measured in parts per million) that were five times lower than those found in similar building materials after the fire. *See* N.T., February 21, 2007, at 2589. Monsanto notes that, at trial, Appellants vigorously disputed that smoke and soot from the fire spread beyond the sixth floor, but were contradicted by a DGS engineer; a DGS deputy secretary; a DGS environmental consultant; and Harrisburg's fire chief, who described having seen smoke and soot throughout the Building during the fire and/or having witnessed the products of combustion in the aftermath. *See* N.T., February 7, 2007, at 1148–1149; N.T., February 16, 2007, at 2213; N.T., February 20, 2007, at 2547; N.T., February 28, 2007, at 3663. Moreover, Monsanto observes that the jurors viewed two videotapes of the fire, providing visual

confirmation of its impact. Additionally, Monsanto develops that its fire expert and the fire chief described the various mechanisms by which the products of combustion spread vertically and horizontally throughout the building, such as through unsealed shafts housing cables. *See* N.T., February 16, 2007, at 2244–2245. Thus, Monsanto asserts, there was ample evidence from which the jury could conclude that PCBs found on building surfaces following the fire did not derive from the intended use of building products such as would be necessary to support Appellants' defect theories under *DGS I*.

Monsanto also catalogues its evidence contradicting Appellants' experts' theories of dissemination through ductwork operation and fabrication, which it contends were without credible scientific or evidentiary foundation. *See, e.g.*, Brief for Appellee at 17 ("In order to prove that PCB contamination pre-dated the fire, Plaintiffs contrived a theory through their experts . . . that PCBs evaporated out of the solid glue matrix (of which PCBs were one of 12 constituents) that affixed the aluminum backing of the HVAC ductboard to its fiberglass interior, traveled through a dense one-inch mat of fiberglass, and flew from the surface of the fiberglass into the occupied areas of the Building during the winter heating season."). Monsanto points to the evidence that PCBs evaporate 100 million times more slowly than water, *see* N.T., February 21, 2007, at 2607–2608, and that very few of over 5,000 air tests conducted in the T & S Building after the fire indicated any presence of PCBs, *see id.* at 2608–2612. Further, Monsanto details various criticisms of tests performed on ductwork segments by Appellants' expert, since he utilized pieces taken from the building after the fire; subjected them to conditions not found in the building; and was unable to maintain even the designed controls. *See* N.T., February 21, 2007, at 2627–2631. With regard to Appellants' theory that PCBs were released in the fabrication of the ductwork, again, Monsanto refers to evidence that the PCB-containing glue was trapped between three layers of aluminum and a one-inch thick layer of fiberglass insulation, thus preventing any escape. *See* N.T.,

February 12, 2007, at 2623–2627.[3]

Concerning the presence of PCBs from caulk, Monsanto notes that the jury heard testimony that, under prevailing federal regulations, the caulking material did not have to be removed, nor if removed, disposed of in a special landfill designated under the Toxic Substances Control Act. *See* N.T., February 21, 2007, at 2634–2635. Further, according to Monsanto, none of Appellants' experts established a pathway of exposure of Building occupants to the caulk, and thus, any actual health risk. Monsanto's expert also testified that the mastic under the carpeting did not require remediation. *See* N.T., February 21, 2007, at 2590–2595. Finally, Monsanto highlights its expert's testimony that PCBs escape into the environment for reasons principally related to the disposal practices of users, *see* N.T., February 31, 2007, at 2682–2683, and his unequivocal opinion that, because of their stability, PCBs did not volatilize and escape from the building products found in the T & S Building. *See* N.T., February 21, 2007, at 2606–2608, 2617–2627.

In accordance with the foregoing, Monsanto observes that, without objection and consistent with *DGS I*, the trial court instructed the jurors to decide whether Monsanto's product was unsafe for its intended use in the T & S Building. Since there was substantial evidence that the product, used as intended, did not create a health risk, Monsanto concludes that the jury could reasonably find (and found) that its product was not defective.

 In evaluating a claim that a verdict is against the weight of the evidence, Pennsylvania courts employ a shocks-the-conscience litmus. *See Armbruster v. Horowitz*, 572 Pa. 1, 9–10, 813 A.2d 698, 703 (2002) (explaining that "a new trial should be granted only in truly extraordinary circumstances, *i.e.*, 'when the jury's verdict is so contrary to the evidence as

---

**3.** Monsanto also offered evidence that even if there had been some escape during the installation process, because of the stability of PCBs, the amount that could have volatilized throughout the T & S Building would have been only one-hundredth of an ounce, or less than a drop. *See* N.T., February 21, 2007, at 2627.

to shock one's sense of justice and the award of a new trial is imperative so that right may be given another opportunity to prevail'" (quoting *Thompson v. City of Philadelphia,* 507 Pa. 592, 598, 493 A.2d 669, 672 (1985))). The trial judge's authority to award a new trial on weight-of-the-evidence grounds is narrowly circumscribed on account of the principle that credibility questions are exclusively for the fact finder. *See id.* (explaining that "[a] trial judge cannot grant a new trial 'because of a mere conflict in testimony or because the trial judge on the same facts would have arrived at a different conclusion'"). The matter is couched as discretionary in the trial court, with its role in the assessment being afforded primacy in view of its substantially closer vantage to the evidentiary presentation as compared to that of an appellate court. *See id.* (" 'Whereas a trial court's decision to grant or deny a new trial is aided by an on-the-scene evaluation of the evidence, an appellate court's review rests solely upon the cold record.' ").[4] Relief is available in an appellate court only if it can be said that the trial court acted capriciously or palpably abused its discretion. *See id.*

■ We agree with Monsanto that the Commonwealth Court did not abuse its discretion in denying a new trial on product-defect grounds. As previously noted, *DGS I* established that the jury could not base a finding of defect on fire-related contamination, as incineration of Monsanto's product was not an intended use. *See DGS I,* 587 Pa. at 252–60, 898 A.2d at 600–04. Accordingly, the trial court, after instructing the jurors that Monsanto was responsible to provide its product "with every element necessary to make it safe for its intended use and without any condition that makes it unsafe for its intended use," explained that:

> the incineration of building products is not a use intended by the manufacturer. Under Pennsylvania law, damages in this case are unavailable for fire-related PCB contamination. As jurors, you are required to distinguish between any PCB

---

4. Although in this case post-trial motions were resolved by a three-judge panel, notably, the trial judge was a member and, indeed, authored the panel opinion.

contamination that existed before the fire and PCB contamination spread by the fire.

N.T., March 1, 2007, at 4011.

While there were various samplings of PCBs found on surfaces in the T & S Building above the level recommended by the National Institute for Occupational Safety and Health, and some above the ceiling established by the Environmental Protection Agency, the parties vigorously contested whether these derived from ordinary use of building products or from the fire. Moreover, as developed above, substantial evidence was presented to support both positions. Monsanto's evidence included the testimony of a registered professional engineer specializing in PCBs, which proceeded as follows:

Q. Based upon your investigation, and your 30 years of experience on working on PCB projects, can you tell us where the PCBs that were found after the fire, where they came from?

A. The materials that burned in this situation in the fire within the T & S Building were the ductboard containing the PCB adhesive, and the light fixtures that contained PCB capacitors. Those were the two sources.

Q. Okay. The answer to my question though is, the PCBs that were found on surfaces after the fire, where did they come from?

A. They came—they came from those sources. They were exactly the same [types of PCBs]. . . . So you could trace it very easily with the fingerprint of the type of PCB.

Q. And what is it that caused them to be released?

A. They simply were distributed by the smoke and fire.

Q. Of the what, as a result of what?

A. As a result of the fire and the burning of these products.

N.T., February 21, 2007, at 2583–84.

Based on this and other items of Monsanto's evidence, the jurors reasonably may have concluded that it was the fire, and

not any intended use of PCBs, that was the vehicle by which PCBs were distributed to surfaces throughout the Building. Further, as Monsanto develops, its expert also testified that the PCBs deriving from the outside caulk and floor mastic did not pose any risk to human health and did not need to be remediated. *See* N.T., February 21, 2007, at 2590–2595. While Appellants certainly are free to disagree with the verdict, we do not find it to be of the variety that shocks the conscience. Thus, we conclude that there is insufficient basis to disturb the trial court's decision to deny Appellants' request for a new trial.[5]

## II. Fire–Safety Features/ Repair Costs

The Commonwealth Court next addressed Appellants' argument that the trial court erred in permitting Monsanto to introduce evidence that the T & S Building lacked a sprinkler system and other fire-safety features, and evidence regarding repair costs that Appellants did not seek to recover, thus purportedly suggesting negligence on Appellants' part in the maintenance of the building. The court explained that the admission or exclusion of evidence lies within the sound discretion of the trial court. *See DGS II*, 927 A.2d at 731 (citing *McManamon v. Washko*, 906 A.2d 1259, 1268–69 (Pa.Super.2006), *appeal denied*, 591 Pa. 736, 921 A.2d 497 (2007)). Initially, the court noted that the evidentiary rulings in issue bore no relevance to the only issue reached by the jury (product defect), and therefore, it reasoned that any error in the evidentiary rulings would be harmless. *See id.*

On the merits, the Commonwealth Court explained that, although evidence of negligence has no place in strict liability actions, *see DGS II*, 927 A.2d at 731 (citing *Kimco Development.Corp. v. Michael D's Carpet Outlets*, 536 Pa. 1, 7–9, 637 A.2d 603, 607 (1993)), evidence which is inadmissible for one

5. We also find Appellants' claim arising out of the trial judge's displeasure with post-verdict juror interviews, which amounts to an assertion of bias, to be without foundation. Whatever the merits of the criticisms of Appellant's counsel, there is nothing to connect the trial judge's perspective on this subject with the Commonwealth Court's developed reasoning concerning the unrelated weight-of-the-evidence claim.

purpose may be admissible for another. *See id.* (citing *Spino v. John S. Tilley Ladder Co.,* 548 Pa. 286, 298, 696 A.2d 1169, 1174–75 (1997)). In this regard, the court observed that a plaintiff in a strict liability action must show the product was defective, and the defect was the proximate cause of his injury. *See id.* (citing *Madonna v. Harley Davidson, Inc.,* 708 A.2d 507, 508 (Pa.Super.1998)). Consequently, the court indicated, " '[i]nquiry into the plaintiff's use of the product may be relevant as it relates to causation.' " *Id.* at 509.

In the present case, the court determined that the contested evidence was relevant primarily to rebut Appellants' damage claims. According to the court, the evidence of lack of a sprinkler system and other safety features was admitted to show the condition of the Building prior to the 1994 fire and detection of PCBs. *See DGS II,* 927 A.2d at 731. Further, the court explained that "[t]his evidence tends to deflate the Building's pre-fire market value, and it was necessary to refute Plaintiffs' claims that the Building was a 'showcase.' " *Id.* The court concluded:

> We thoroughly examined Defendant's use of the evidence throughout the trial, including closing argument, and find it respected the use for which the evidence was offered. Moreover, we fail to see how introduction of the Building's lack of safety features could affect the jury's decision that Defendant's product was not safe for its intended use. Plaintiffs' argument that the jury may have found Defendant's product not defective based on evidence the Building lacked certain safety features is pure speculation, which, if accepted, necessitates the conclusion the jury disregarded the trial judge's limiting instructions. We presume, however, the jury followed the instructions. *Mt. Olivet Tabernacle Church v. Edwin L. Wiegand Div.,* 781 A.2d 1263 (Pa.Super.2001), *aff'd,* 571 Pa. 60, 811 A.2d 565 (2002). Where there is no evidence to support such an argument, a new trial is not warranted.

*Id.* at 732.

In a footnote, the Commonwealth Court also addressed Appellants' argument that the jury may have improperly

considered Appellants to have been responsible for the fire, because the trial court failed to repeat the limiting instruction when the jury requested an additional charge regarding product defect. The court emphasized that the trial court provided the parties with the opportunity to correct any errors or insufficiencies before the jury returned to deliberations, and that neither party requested further clarification. *See DGS II*, 927 A.2d at 732–33 n. 8 (citing N.T., March 2, 2007, at 4057).

Presently, Appellants argue in general terms that the trial court erred in the first instance in admitting the evidence of lack of fire-safety features and costs of repair. The thrust of their argument, however, goes to Monsanto's use of the evidence. In this regard, Appellants stress that the trial court admitted the evidence for limited purposes, clearly ruling that it could not be used to prove negligence on their part. According to Appellants, however, Monsanto blatantly ignored such limitation, particularly in its counsel's closing argument to the jury. *See, e.g.*, Brief for Appellants at 36–37 (delineating examples of such asserted excesses, including Monsanto's counsel's statement: "And don't you think the Commonwealth knew that after the fire, after they had egg on their face because they didn't sprinkler the building, when they announced, we're out of there in a year, put in sprinklers, and take out asbestos." (quoting N.T., March 1, 2007, at 3946–3947)). Further, Appellants maintain their criticism that, when the jury requested that the instruction regarding product defect be reread, the limiting instruction concerning sprinklers, other safety features, and costs of repair was not included.

We agree with the Commonwealth Court that the trial court's decision to admit evidence of a lack of fire-safety features and costs of repair was within its discretion. In the damages portion of the jury charge, without objection, the trial judge instructed the jurors that: "In thinking about market value, you may consider depreciation, including physical deterioration, design, and other deficiencies of the structure ..." N.T., March 1, 2007, at 4020; *accord DGS I*, 587 Pa.

at 251–52, 898 A.2d at 599–600. The complained-of evidence was directly relevant in this regard. Indeed, at least with regard to absence of fire-safety features, Appellants concede that the evidence was "arguably relevant to the issues of causation and damages." Brief for Appellants at 41.

■■ There is at least colorable merit to the thrust of Appellants' argument, namely, that Monsanto's counsel exceeded the bounds of the limited purposes for which the fire-safety and cost-of-repair evidence was admitted in his closing argument. However, Appellants failed to lodge an objection to the closing to afford the trial judge the contemporaneous opportunity to take corrective action. In the circumstances, the present claim is waived. *See Harman ex rel. Harman v. Borah,* 562 Pa. 455, 475, 756 A.2d 1116, 1127 (2000) (explaining that "[f]ailure to raise a prompt objection is a valid reason for the trial court to deny a motion for a new trial"); *Craley v. Jet Equipment & Tools, Inc.,* 778 A.2d 701, 706–07 (Pa.Super.2001) (holding that a moving party waived objections to remarks in opponent's closing argument by failing to object and could not assert error for the first time in post-trial motions); *Richardson v. LaBuz,* 81 Pa.Cmwlth. 436, 451, 474 A.2d 1181, 1192–93 (1984).[6] Similarly, as the Commonwealth Court indicated, Appellants did not request that the limiting instruction be repeated when the jury asked for supplemental instructions concerning product defect. Thus, this aspect of Appellants' claim is also waived. *See id.*

### III. Limits on *Voir Dire*

In response to Appellants' claim that they were provided insufficient opportunity for *voir dire,* the Commonwealth Court observed that the trial judge conducted preliminary *voir dire* to address threshold issues of venireperson availability and hardship and distributed a written questionnaire to the remaining venire panel to secure additional information. The court noted that both parties were afforded an opportunity to

---

**6.** Appellants reference no portion of the record other than the closing argument of Monsanto's counsel where they contend that the limited purposes for which the evidence was admitted were exceeded.

examine and comment upon the questionnaire, and neither party objected to the form. *See DGS II*, 927 A.2d at 732. It explained that the purpose of *voir dire* is to empanel a competent, fair, impartial, and unprejudiced jury, *see id.* at 733 (citing *Williams v. SEPTA*, 741 A.2d 848, 854 (Pa.Cmwlth. 1999)), and the scope of *voir dire* is within the sound discretion of the trial judge, *see id.* The court explained that Appellants' counsel was able to inquire whether the panel members had any financial connection to the Commonwealth; contact with the government generally; information regarding the T & S Building; negative impressions of lawsuits generally; membership in organizations to reform the legal system; involvement in any issues regarding chemicals; concerns regarding liability for products sold in the distant past; experiences involving asbestos; or reasons why they could not serve fairly and impartially. Additionally, the court indicated that the trial court neither restricted nor interfered with Appellants' thorough explanation of the venirepersons' responsibilities.

The Commonwealth Court also noted that the trial judge granted a request by Appellants for additional time for *voir dire*, explaining as follows:

> After several hours of preliminary questions relating to the length of trial, Plaintiffs' counsel reviewed the jury questionnaires and embarked on general oral *voir dire*. After approximately 50 minutes of questioning by Plaintiffs' counsel, the trial judge inquired how much longer he intended to continue. At side-bar, the following colloquy occurred:

> [Plaintiff's counsel:] I don't know how much [Defendant's counsel] feels, but a bunch of these questionnaires have people that said they can't be fair about—maybe 10 of them,

> . . .

> THE COURT: There are two people who said they can't be fair. I don't know how much time that's going to take. Look, tell me what you need. This is an important part of trial, I understand that. But I'd like to get this done if we can. And you were certainly schmoozing and spending your time freely for a while. . . .

* * *

THE COURT: So this is my opportunity to focus you. How much time do you need?

[Plaintiff's counsel]: 30 minutes.

THE COURT: [Defendant's counsel] gets the same amount of time. Okay.

*DGS II,* 927 A.2d at 734 (quoting N.T., January 29, 2007, at 159). According to the Commonwealth Court, counsel was given all the time he requested and made no further requests. *See id.* In a footnote, it expressed the conclusion that any challenge to the *voir dire* proceedings was waived on account of counsel's failure to object. *See DGS II,* 927 A.2d at 734 n. 11 (explaining "one must object to errors, improprieties or irregularities at the earliest possible stage of the adjudicatory process to afford the jurist hearing the case the first occasion to remedy the wrong and possibly avoid an unnecessary appeal" (citing *McManamon,* 906 A.2d at 1268–69)).

Appellants' present arguments fail to address the Commonwealth Court's express finding of waiver, with which we can find no fault. Accordingly, this claim provides no basis for relief.

The order of the Commonwealth Court is affirmed.

Chief Justice CASTILLE, and Justice EAKIN and BAER, Justice TODD and Justice McCAFFERY join the opinion.