Niki D' Atri Enterprises, Inc., a      :
Pennsylvania Corporation doing      :
business as Crows Run Recycling      :
(Tenant)      :
     :
            v.      :
     :
Commonwealth of Pennsylvania,      :
Department of Transportation,      :   No. 257 C.D. 2022
            Appellant      :   Argued: February 7, 2023

BEFORE:    HONORABLE PATRICIA A. McCULLOUGH, Judge
                HONORABLE CHRISTINE FIZZANO CANNON, Judge
                HONORABLE MARY HANNAH LEAVITT, Senior Judge

OPINION NOT REPORTED

MEMORANDUM OPINION
BY JUDGE FIZZANO CANNON            FILED: March 17, 2023

       The Commonwealth of Pennsylvania, Department of Transportation (DOT) appeals from an order of the Court of Common Pleas of Beaver County (trial court) dated February 25, 2022. The trial court denied DOT's post-trial motion for a new trial in an eminent domain matter in which the jury awarded $3,189,677 in damages to Niki D' Atri Enterprises, Inc., a Pennsylvania corporation doing business as Crows Run Recycling (Crows Run), for the value in place of salvage yard inventory. DOT contends that the jury was improperly allowed to consider lost profits in its award. Upon review, we affirm the trial court's order.

## I. Background

In April 2016, DOT filed a declaration of taking in order to effect a condemnation of real property in connection with a state road upgrade project. Crows Run operated a salvage yard as a tenant on the affected real property, which its principal, Niki D' Atri (D' Atri), owned personally. *See* Reproduced Record (RR) at 10a. DOT concedes the salvage yard business was not relocated. *See* DOT Br. at 12. Therefore, Section 902(b)(1) of the Eminent Domain Code,[1] 26 Pa.C.S. § 902(b)(1), requires DOT to pay the value in place of Crows Run's inventory, machinery, and equipment.

D' Atri testified at a hearing before a board of viewers that the fair market value of the inventory was $10,374,874.61 and the market value of the machinery and equipment was $487,045.00. RR at 11a & 18a. By contrast, Charles Dixon (Dixon), a certified appraiser testifying as DOT's expert witness, opined that the inventory's value in place was $215,875.00 and the value of the machinery and equipment was $292,935.00. *Id.* at 14a. The board of viewers awarded a total of $600,000.00 for the inventory, machinery, and equipment. *Id.* at 22a.

Crows Run appealed to the trial court, which held a jury trial in October 2021. D' Atri renewed his assertion of value of the inventory and presented an itemization of his asserted valuation of each recoverable part on each of 1,187 disabled vehicles in the salvage yard. RR at 308a-16a & 541a-6578a. DOT objected to D' Atri's evidence on the basis that it included lost profits, but the trial court overruled the objection. *Id.* at 315a-16a. The trial court also denied DOT's proposed jury instruction seeking to preclude consideration of lost profits in calculating the inventory's value. *Id.* at 30a & 372a-73a.

---

[1] 26 Pa.C.S. §§ 101-1106.

The jury awarded $3,189,677.00 for the inventory and $389,990.50 for the machinery and equipment. RR at 188a. The trial court denied DOT's post-trial motion and affirmed the jury's verdict. DOT then appealed to this Court. On appeal, DOT challenges only the valuation of the inventory.

## II. Issue

DOT acknowledges that Crows Run was entitled to recover the original costs or replacement costs of the disabled vehicles and any parts that had been removed from those vehicles and readied for sale. However, DOT posits that the method used by D' Atri to calculate the inventory value included a markup and, as such, included lost profits. DOT asserts that the trial court committed reversible error by admitting evidence of Crows Run's lost profits, contrary to Section 902(b)(1) of the Eminent Domain Code and related relocation assistance regulations, as well as by refusing to provide a jury instruction forbidding an award of lost profits.[2]

---

[2] Regarding challenges to evidentiary rulings, our Supreme Court has explained:

> [E]videntiary rulings are within the sound discretion of trial courts . . . . Accordingly, when a party adverse to a trial court's evidentiary ruling seeks appellate review of that determination, that party carries a heavy burden to demonstrate that the trial court abused its discretion . . . . An appellant cannot meet this burden by simply persuading an appellate court that it may have reached a different conclusion [from] that reached by the trial court; rather, to overcome this heavy burden, the appellant must demonstrate that the trial court actually abused its discretionary power.

> Regarding the "abuse of discretion standard" of review, this Court has explained that the term "discretion" imports the exercise of judgment, wisdom and skill so as to reach a dispassionate conclusion, within the framework of the law, and is not exercised for the purpose of giving effect to the will of the [trial] judge . . . .

3

### III. Discussion

Section 902(b)(1)(i) of the Eminent Domain Code provides:

> A displaced person who is displaced from a place of business or from a farm operation shall be entitled, in addition to any payment received under subsection (a), to damages for dislocation of business or farm operation as follows:
>
>> (1) Damages equal to the value in place of the personal property which:
>>
>>> (i) is not moved because of the discontinuance of the business or farm operation or the unavailability of a comparable site for relocation . . . .

26 Pa.C.S. § 902(b)(1)(i). A related regulation provides the following pertinent definitions:

> *Original cost of personal property to the displaced person*—The amount paid by the displaced person for the

---

Absent an abuse of that discretion, an appellate court should not disturb a trial court's discretionary ruling . . . . An appellate court will not find an abuse of discretion based on a mere error of judgment, but rather . . . where the [trial] court has reached a conclusion which overrides or misapplies the law, or where the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will.

*Commonwealth v. Distefano*, 265 A.3d 290, 297-98 (Pa. 2021) (internal quotation marks and citations omitted).

Regarding challenges to jury instructions, "a trial judge has wide latitude in his or her choice of language when charging a jury, provided always that the court fully and adequately conveys the applicable law." *Hall v. Jackson*, 788 A.2d 390, 399 (Pa. 2001) (quoting *Wilson v. Anderson*, 616 A.2d 34, 36 (Pa. Super. 1992) (additional quotation marks omitted)). This Court's review of a trial court's jury instructions is limited to determining whether the trial court abused its discretion or committed an error of law; even if the trial court erred in its jury instructions, we will not award a new trial "unless the jury charge in its entirety was unclear, inadequate, or tended to mislead or confuse the jury." *Hall*, 788 A.2d at 399 (quoting *Fragale v. Brigham*, 741 A.2d 788, 790 (Pa. Super. 1999) (additional quotation marks omitted)).

personal property, as indicated in his business records. In the event of personal property which was obtained without cost or for which there are no records, the replacement cost of equivalent property at the time of sale shall be used.

. . . .

*Replacement cost of equivalent property at the time of sale*—The current market cost, including delivery and installation costs, of similar personal property, considering such factors as physical and economic depreciation and functional obsolescence.

. . . .

*Value in place of personal property*—The value the personal property would have, installed in real property housing a going business, considering such factors as original cost, delivery and installation costs, physical and economic depreciation and functional obsolescence.

37 Pa. Code § 151.1.

## A. Replacement Cost and Profit

DOT's first assertion of error relates to the evidence Crows Run offered at trial concerning its damages. Crows Run asserts that replacement cost is the proper valuation of its inventory. To support its claim, Crows Run relies largely on *Pikur Enterprises, Inc. v. Department of Transportation*, 641 A.2d 11 (Pa. Cmwlth. 1994). In *Pikur*, a property owner was in the business of servicing corporate automobile fleets. In the course of providing those services, Pikur accumulated an inventory of automobile parts that it removed from the corporate vehicles; thus, that inventory was acquired at no cost. *Id.* at 12. When DOT exercised its eminent domain powers for a road project, Pikur could not relocate its business and sought payment for the value of its inventory. *Id.* at 14. DOT argued that Pikur could not recover more than the original cost of the inventory, which was zero; but the

5

common pleas court allowed evidence of replacement cost, and this Court affirmed.[3] *Id.* Here, based on *Pikur*, Crows Run argues that the cost of the vehicles is not reflective of the value in place of the numerous saleable parts in each vehicle.

There is no dispute that Crows Run is entitled to the value in place of its personal property, including its parts inventory. *See* 26 Pa.C.S. § 902(b)(1). As set forth above, the "value in place" is determined "considering such factors as original cost, delivery and installation costs, physical and economic depreciation and functional obsolescence." 37 Pa. Code § 151.1. Further, "[i]n the event of personal property which was obtained without cost or for which there are no records, the replacement cost of equivalent property at the time of sale shall be used." *Id.*

*Pikur* is not directly on point because, there, the inventory had no cost. Here, the cost of Crows Run's parts inventory was subsumed in the purchase price of each vehicle; it was not zero. Thus, the parts inventory here was not "obtained without cost." 37 Pa. Code § 151.1.

However, D' Atri testified he did not have records documenting the purchase price of each vehicle in his inventory and did not know the specific price he paid for each. RR at 319a-21a. If the jury credited that testimony, then the parts inventory constituted personal property "for which there are no records." 37 Pa. Code § 151.1. That would allow Crows Run to recover replacement costs of the inventory. *Id.*

---

[3] This Court also discerned no abuse of discretion in the common pleas court's exclusion of Pikur's tax returns, which DOT sought to offer as evidence of the salvage value of inventory items acquired without cost; we concluded that the nominal salvage value shown in the tax returns was not probative because it was "not reflective of actual value in place as defined in the regulations . . . ." *Pikur Enters., Inc. v. Dep't of Transp.*, 641 A.2d 11, 14 (Pa. Cmwlth. 1994). However, the Court did not hold that lost profits could be included in actual value. *See id.*

Nonetheless, assuming that Crows Run was entitled to recover replacement cost, most of its evidence at trial related to calculating replacement costs in terms of its resale prices for individual parts. Despite D' Atri's insistence to the contrary, those calculations clearly included profit. For example, Crows Run sought to recover $6,500 as replacement cost of the parts in a Chevrolet Cavalier it purchased for $1,000 plus $200 in transport costs; on cross-examination regarding his calculation of replacement cost, D' Atri testified as follows:

> Q.  So for a vehicle like that, you have 1,200 bucks in it; right?
>
> A.  Um-hum.
>
> Q.  And, now that tells me, tell me if I'm correct, that if someone had come into your shop and bought that vehicle for 1,200 bucks, you would have broke [sic] even?
>
> A.  Bought the vehicle for 1,200?
>
> Q.  For 1,200.  Your objective was to make money on the vehicle, of course?
>
> A.  Yes.
>
> Q.  But I'm saying, you could have sold that vehicle for $1,200 and not lost money?  You just wouldn't have made any money?
>
> A.  Wouldn't have made any money.
>
> Q.  Okay.  So, so when you sell it to []DOT or you charge []DOT $6,500 and change, you're selling it to []DOT at, if my math is correct, 5,2- [sic] or $5,300 above what you could have sold it for and what you could have broke [sic] even with?
>
> A.  Well, so *the $5,000 profit* on that particular car, the Cavalier we're talking about, I was going through my parts inventory and putting the fair market value in place to those parts.  So the number that I came up with on that Cavalier that equaled 6,000 wasn't a profit of, it wasn't

7

intended for a profit. Those were actual, my costs if I had to replace them.

Q.     Now, the, what you were using were your sales figures from the year before. So what you did is you, and again, these are questions. *You took, basically on paper you cannibalized the car and added up what you could have sold the parts for?*

A.     *Added up what I could sell the parts for*, yes.

RR at 320a (emphasis added). Indeed, in a sidebar conference out of the jury's hearing, counsel for Crows Run argued, in support of allowing replacement cost evidence based on selling price, "Say[] I sold this property for X number of dollars, *which includes profit* as does any business, and I'm utilizing comparable sales in this case, and that's exactly what's happened here." RR at 315a-16a (emphasis added).

A "profit" is,

most commonly, the gross proceeds of a business transaction, less the costs of the transaction; *i.e.*, net proceeds. Excess of revenues over expenses for a transaction; sometimes used synonymously with net income for the period. Gain realized from business or investment over and above expenditures. Profit means accession of good, valuable results, useful consequences, avail, gain, as in office of profit, excess of returns over expenditures, or excess of income over expenditure.

*Del. Cnty. v. First Union Corp.*, 929 A.2d 1258, 1263 n.14 (Pa. Cmwlth. 2007) (quoting *Black's Law Dictionary* 1090 (5th ed. 1979) (quotation marks omitted)). As discussed above, Crows Run's evidence of replacement cost was mainly based on its retail selling prices. D' Atri, as the principal of Crows Run, conceded that he bought the vehicles to sell the parts and make a profit. RR at 321a. Therefore, those prices undeniably included an "accession of good, valuable results, useful consequences, avail, gain, . . . excess of returns over expenditures, or excess of

8

income over expenditure." *Del. Cnty.*, 929 A.2d at 1263 n.14 (quoting *Black's Law Dictionary*).  We agree with DOT that Crows Run's retail selling prices included an unspecified amount of profit.

In opposing the position of Crows Run, DOT relies on *Cox v. Philadelphia, Harrisburg & Pittsburg[4] Railroad Company*, 64 A. 729 (Pa. 1906).  In *Cox*, a railroad took by eminent domain part of a piece of farm property that was used for raising ducks.  In valuing the land taken, the owner argued that the reduction in size of the property reduced by 2,000 the number of ducks he could raise, contending that he was entitled to 25 years of profits lost on 2,000 ducks per year. *Id.* at 731.  Our Supreme Court concluded that the testimony of the plaintiff's witnesses "clearly showed that their valuation of the property for [duck farm] purposes rested upon a[n] erroneous basis, the profits which the plaintiff would realize out of the business conducted upon the land." *Id.* at 730.  The Court cited as long-settled law the principle "which prohibits the landowner from having the profits of his business considered by the jury in determining the value of the property . . . ," observing that "[w]e have so often said . . . that the profits of business could not be recovered in condemnation proceedings that it seems like a waste of time to cite the decisions." *Id.* (internal citation and quotation marks omitted).

Although *Cox* is not factually on point, we agree with DOT that lost profits may not be included in calculating replacement cost.  Thus, we conclude that

---

[4] In 1891, the United States Board on Geographic Names (Board) decided to standardize geographic names, including dropping the final "h" from any name ending in "burgh." https://www.mentalfloss.com/article/52943/how-pittsburgh-got-its-h-back-and-7-other-geographic-naming-oddities (last visited Mar. 16, 2023).  Pittsburgh, however, had been named by General John Forbes, whose Scottish background was the reason for the spelling; to the city's residents, "[t]o edit the spelling to the German 'burg' was akin to editing the city's founding." *Id.*  In 1911, the city finally prevailed on the Board to return to the original spelling. *Id.*  The cited case, as its date indicates, was decided during the period before the city regained the "h" in its name.

D' Atri's evidence asserting a total replacement cost of $10,374,874.61 in inventory was improper to the extent that figure was based on retail sales prices, which necessarily included profit.

## B. Requested Jury Instruction Regarding Profit

DOT's second assertion of error relates to the trial court's charge to the jury. DOT requested that the trial court's jury instructions include Pennsylvania Standard Civil Jury instruction 22.100, which provides:

> For business condemnees, the value of lost profits as a result of a taking must not be considered as a separate item of damage in measuring just compensation for the condemnee.
>
> A qualified valuation expert may, however, consider the loss of income to a business only to the extent that it is relevant to determining the effect of the condemnation on the real estate.

Pa. SSJI (Civ) 22.100; RR at 30a. The trial court declined to give that instruction, reasoning that the evidence had not included lost profits, but only replacement costs. RR at 373a. Instead, the trial court then gave the following valuation instruction:

> Just compensation is the difference between the fair market value of the property in question immediately before the government took the property and as unaffected by the taking and the fair market value of the property remaining immediately after the taking and as it was affected by it.
>
> Those are the damages you have to assess here. There is no dispute that damages occurred. It will be up to you to decide what that damage is based upon the evidence.
>
> And that brings us to what we call the fair market value. The fair market value is the price that would be agreed to by a willing and informed seller and buyer . . . .

10

*Id.* at 397a.  DOT maintains that the trial court erred by refusing to instruct the jury that it could not award lost profits.

In determining whether the trial court erred in its jury instructions, we must consider the jury charge as a whole, in light of the evidence presented.  *Volponi v. Bristol*, 551 A.2d 657, 660 (Pa. Cmwlth. 1988) (citation omitted).  Here, D' Atri insisted in his testimony that he was not seeking to recover lost profits, merely replacement costs.  RR at 320a & 322a.  In light of D' Atri's repeated statements that Crows Run was not asking to recover its lost profits, the trial court, in its discretion, declined to instruct the jury not to award them.  However, the jury instruction the trial court actually gave spoke in terms of the price a willing buyer would pay a willing seller, which could well include a profit to the seller.  Thus, the trial court's instruction could have misled and confused the jury.  We therefore conclude that, considering the jury charge as a whole, the trial court erred by refusing to instruct the jury not to award lost profits.

## C. Request for a New Trial

As discussed in Section A above, we conclude that the trial court erred by allowing replacement cost evidence that necessarily included profits, and then declining to give a jury instruction precluding an award of lost profits.  However, our analysis does not end there.  Errors by the trial court do not automatically entitle the moving party to a new trial.  This Court has explained:

> A party requesting a new trial must demonstrate in what way trial error caused an incorrect result . . . .  Determining whether the moving party is entitled to a new trial involves a two-step process . . . .  First, we must decide whether one or more mistakes occurred at trial and, if so, whether the mistake is a sufficient basis for granting a new trial . . . .

11

> The moving party must demonstrate more than harmless error; the mistake will be a sufficient basis for granting a new trial where the party demonstrates prejudice resulting from the mistake . . . .

*Zenak v. Police Ath. League of Phila.*, 132 A.3d 541, 553 (Pa. Cmwlth. 2016) (quoting *Dep't of Gen. Servs. v. U.S. Min. Prods. Co.*, 927 A.2d 717, 723 (Pa. Cmwlth. 2007), *aff'd*, 956 A.2d 967 (Pa. 2008) (internal quotation marks omitted)). Thus, DOT, as the party seeking a new trial, had the burden of demonstrating prejudice arising from the trial court's errors in admitting valuation evidence that implicitly included profits and then refusing to instruct the jury not to award such profits as damages.

Crows Run asserted that its inventory had a total value of $10,374,874.61, RR at 11a, which, as discussed above, included an unspecified amount of profit. DOT's valuation expert opined that the vehicles had only scrap value, totaling $139,000, and that the entire inventory had a value of $215,875.00. *Id.* at 14a, 380a & 383a. The jury awarded $3,189,677. *See id.* at 188a. Clearly, the jury was not fully persuaded either by Crows Run's evidence concerning replacement costs or DOT's evidence of scrap value.

At trial, D' Atri testified concerning the approximate purchase prices of the vehicles he bought in order to acquire his parts inventory. He stated that prices varied from $300 to as much as $8,000 but were typically in the range of $1,000 to $3,000. RR at 319a & 321a. He also testified to additional costs of about $200 per vehicle for transporting purchased vehicles and preparing them for storage, plus labor costs associated with pulling and cleaning the loose parts that were in the inventory. RR at 320a-21a. The jury's award of $3,189,677 amounted to about $2,687 for each of the 1187 vehicles, well within the price range D' Atri testified

was the average purchase price he paid for vehicles, even without separating out the extra costs of transportation and labor.

Thus, the jury's award appears to be consistent with the evidence of average vehicle cost. As such, it does not indicate inclusion of profits. We conclude that DOT has not met its burden of showing prejudice resulting from the trial court's error. Thus, no new trial is merited.

## IV. Conclusion

Based on the foregoing discussion, we conclude that the trial court's errors in allowing evidence of prices including profit and then failing to instruct the jury not to award lost profits were harmless. Accordingly, the trial court's order is affirmed.

_____
CHRISTINE FIZZANO CANNON, Judge

13

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Niki D' Atri Enterprises, Inc., a      :
Pennsylvania Corporation doing      :
business as Crows Run Recycling      :
(Tenant)      :
     :
          v.      :
     :
Commonwealth of Pennsylvania,      :
Department of Transportation,      :    No. 257 C.D. 2022
               Appellant      :

O R D E R

AND NOW, this 17th day of March, 2023, the order of the Court of Common Pleas of Beaver County dated February 25, 2022, is AFFIRMED.

_____
CHRISTINE FIZZANO CANNON, Judge